Ignacio V. **GONZALEZ**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–96–00130–CR.

Court of Appeals of Texas,
San Antonio.

Aug. 20, 1997.

Raymond Martinez, San Antonio, for Appellant.

Angela Moore, Assistant Criminal District Attorney, San Antonio, for Appellee.

Before RICKHOFF, GREEN and JOHN F. ONION, Jr.,[2] JJ.

## OPINION

JOHN F. ONION, Jr., Justice (Assigned).

This appeal is taken from convictions for misapplication of fiduciary property of the value of $200 or more but less than $10,000, all third-degree felonies at the time of the commission of the offenses.[3] In a bench trial, the trial court found appellant guilty of the three offenses and placed appellant on community supervision for ten years.

Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 941), amended by Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3652–53 (current version at TEX. PENAL CODE ANN. § 32.45 (Vernon 1994)). For convenience in this opinion, we cite to the penal code version in effect at the time of the offense.

**2.** Assigned to this case by the Chief Justice of the Supreme Court of Texas.

**3.** Act of May 23, 1991, 72nd Leg. R.S., ch. 565, § 2, 1991 Tex. Gen. Laws 2003, 2004 (amending

## POINTS OF ERROR

Appellant advances three points of error. First, appellant contends that the trial court failed to apply the correct standard in determining that appellant was a fiduciary under the statute. Second, appellant urges that the "trial court erred in finding an agreement existed under which the fiduciary held property" for the purpose of the statute. Third, appellant asserts that there was no evidence to support a restitution order of $10,901 as a condition of community supervision.

The first two points of error are actually challenges to the legal sufficiency of the evidence to support the convictions and are briefed as such. Appellant contends that the State failed to show that he, as a store clerk, was a fiduciary within the meaning of the statute or that there was an agreement which was essential to a conviction for misapplication of property by a fiduciary. Section 32.45 of the Texas Penal Code in effect at the time of the commission of the offenses provided:

(a) For purposes of this section:

  (1) "Fiduciary" includes:

    (A) trustee, guardian, administrator, executor, conservator, and receiver;

    (B) any other person acting in a fiduciary capacity, but not a commercial bailee; and

    (C) an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary.

  (2) "Misapply" means deal with property contrary to:

    (A) an agreement under which the fiduciary holds the property; or

    (B) a law prescribing the custody or disposition of the property.

(b) A person commits an offense if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary or property of a financial institution in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held.

(c) An offense under this section is:

  (1) a Class A misdemeanor if the value of the property misapplied is less than $200;

(2) a felony of the third degree if the value of the property is $200 or more but less than $10,000;

(3) a felony of the second degree if the value of the property is $10,000 or more but less than $100,000; or

(4) a felony of the first degree if the value of the property is $100,000 or more.

TEX. PENAL CODE ANN. § 32.45.

In analyzing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the judgment of the conviction in a bench trial to determine whether a rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense charged. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Turro v. State,* 867 S.W.2d 43, 47 (Tex.Crim.App.1993). This standard of review applies to both direct and circumstantial evidence cases. *Green v. State,* 840 S.W.2d 394, 401 (Tex.Crim.App. 1992), *cert. denied,* 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993); *see Geesa v. State,* 820 S.W.2d 154, 160–61 (Tex.Crim.App. 1991). In our review, we must consider all the evidence, whether rightly or wrongly admitted. *Nickerson v. State,* 810 S.W.2d 398, 400 (Tex.Crim.App.1991).

In a bench trial, the trial court is the trier of fact, the judge of the credibility of the witnesses and of the weight to be given their testimony. The trial court is free to accept or reject any or all of any witness's testimony. *See Joseph v. State,* 897 S.W.2d 374, 376 (Tex.Crim.App.1995); *Wicker v. State,* 667 S.W.2d 137, 141 (Tex.Crim.App.), *cert. denied,* 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984); *Price v. State,* 902 S.W.2d 677, 679 (Tex.App.—Amarillo 1995, no pet.); *Alexander v. State,* 823 S.W.2d 754, 756 (Tex. App.—Austin 1992, no pet.).

## FACTS

Craig Rosenstein, President of San Antonio Plumbing Distributors, Inc., testified that his company operated several stores in San Antonio and three stores in other Texas cities. He identified appellant as a store clerk

or "counter employee" at his store located at Cherry Ridge and Loop 410 in San Antonio. Appellant had been employed there since 1991. Previously, appellant had been employed in the same type of position for eight years at the Mars Plumbing Supply Company[4] operated by Maurice Rosenstein, father of Craig. Earlier, appellant had been a chauffeur "for Maurice's father."

Craig Rosenstein testified that appellant was hired because of appellant's experience and the trust that Maurice Rosenstein had in appellant. Craig Rosenstein testified that appellant held a position of trust. Rosenstein explained that appellant had access to and control over the store's inventory and handled cash coming in and going out of the Cherry Ridge store. He described appellant as being "a fiduciary." Rosenstein explained that when a sale of plumbing supplies was made, appellant was required to execute an invoice, collect the money and put it in the register, and deliver the material to the customer. The money was to be collected at the store with the exception that on a few occasions a C.O.D. delivery was permitted. Rosenstein did acknowledge that if the merchandise was ever to leave the store without payment, a pink ticket was to be created and then signed by the purchaser who was to pay by the end of the week. This procedure was reserved for three or four particular plumbers.

Rosenstein told the court that he had a price structure for the items sold by his stores. The regular retail price was applied to the walk-in customer. Discounts were applied in ascending order to contractors. A P–1 discount was given to contractors. A P–2 discount applied to plumbing contractors, and a P–3 discount for plumbing contractors who bought in volume. Counter employees were not authorized to vary the price structure and were never permitted to sell below cost. To meet competition, a counter clerk could vary the price structure only if he received permission from the supervisor at the downtown San Antonio store at Broadway and Jones Avenue.

Memos were issued from time to time regulating the operation of the stores and the procedures to be followed. It was Rosenstein's position that appellant knew and understood the procedures and regulations. The record reflects appellant engaged in the training of other employees. Rosenstein acknowledged that there was no written agreement with appellant or other employees, only oral agreements.

In January 1994, Craig Rosenstein became concerned by the shrinkage in his inventory of plumbing supplies, more particularly at the Cherry Ridge store. The items in stock did not match the sales tickets or the figures on the computer. In March 1994, Rosenstein employed Charles Carter, owner of the North American Advisory Investigative Service, to make an investigation into his diminishing inventory. He testified that Carter reported to him appellant had given a confession that plumbing supplies from the store were being sold without the money going into the store's coffers. Rosenstein viewed the items purchased by the investigators from appellant and stated that the cost of those items to him was $1,447.73.

The record does not show that appellant was targeted. The investigation began with him because he was the senior employee at the Cherry Ridge store and numerous telephone calls were being made to the store asking for appellant. The callers would immediately hang up when informed appellant was not available. In addition, owner Rosenstein had observed a large number of cars at the Cherry Ridge store on Sundays, but the Sunday sales tickets did not bear any reasonable comparison with the number of potential customers. Moreover, Rosenstein observed that the Sunday sales tickets were frequently for small amounts. Appellant worked on Sundays as a counter clerk when no manager was on duty.

Joe Levrie, a certified plumber, was hired by Charles Carter to assist in the investigation. Levrie related that about 7:30 p.m. on March 28, 1994, he went to the Gonzalez Cafe off of Ruiz Street where appellant also worked as a bartender. In the cafe, Levrie asked for a Steve Perez, a fictitious name. He returned to the cafe the next evening and

4. The company was also referred to in the record as the Rams Company.

asked if Perez had been there asking for him. Levrie gave his name as Hector Montelongo. Upon inquiry, Levrie told appellant that Perez worked for Builders Square and was to obtain some plumbing supplies for him. Appellant informed Levrie that he could get the plumbing supplies he needed for half price. On March 30, Levrie gave appellant a list of the supplies and talked to him again on April 1st. Appellant told Levrie to come to the Cherry Ridge store on Sunday, April 10, 1994, to pick up the needed supplies, but to first telephone him at the store. Levrie followed instructions. At the store Levrie paid $4.89 for one item for which an invoice was made, but he received a number of other items which were loaded onto his truck. These items corresponded to the items listed in the first count of the indictment. These items were turned over to Charles Carter. Later that night, Levrie met appellant at the Gonzalez Cafe and paid appellant $140 in cash for the items received. On April 12, 1994, Levrie gave appellant another list of plumbing supplies. On April 16, 1994, he went to the Cherry Ridge store. Again Levrie paid $12.91 for one item for which an invoice was created, but he received a water heater and other items from the back of the store. The items were turned over to representatives of the investigative agency. These items corresponded to the items listed in the second count of the indictment. That night at the Gonzalez Cafe, Levrie paid $200 to appellant who wanted $70 more. Appellant commented that the money would help with his IRS problems. On April 20, 1994, Levrie paid appellant the $70 and gave him another list of needed plumbing supplies. On Sunday, April 24, 1994, Levrie again went to the Cherry Ridge store. There, appellant charged him $76.05 for some copper tubing and an invoice was created. Appellant explained another employee had seen him with the tubing and such action was necessary. Appellant helped Levrie load a number of other items into his truck for which no charge was made at the time. Appellant told Levrie that he was going to use the money he would receive "to go see Selena and Emilio Navaira [perform] at the Market Square." The items Levrie received were delivered to Carter. These items corresponded to the items listed in count three of the indictment. Levrie did not make any additional payment to appellant for these items because appellant was confronted by Charles Carter and Maurice Rosenstein that afternoon and taken to Carter's office.

The plumbing supplies obtained on April 10, 16, and 24 were each shown to have a value of over $200 but less than $10,000 as alleged in counts one, two, and three of the indictment. Craig Rosenstein testified that the items taken on April 10 had a value of $239.70, the items taken on April 16 had a value of $550.60, and that the value of the items taken on April 24 was $687.43. Rosenstein testified that he had not given appellant consent or permission to sell under cost or take property from the company.

Charles Carter testified as to his employment as an investigator and that he secured the services of Joe Levrie. He related that on April 24, 1994, he took a written confession from appellant, who freely and voluntarily gave it. Appellant, however, refused to give a second statement the next day. The written confession was introduced and it roughly corresponded to Levrie's version of the facts. Carter also testified that appellant made oral statements and admissions against interest. Carter stated that appellant confessed that for eighteen months he had been stealing $600 worth of plumbing supplies each week from the company. Carter estimated the value of the property taken to be $46,800.

Gerald Winston, the Cherry Ridge store manager at the time in question, was a defense witness. He testified that appellant held a position of trust with the company and that appellant did not have his permission to make off-premises sales or accept money at the Gonzalez Cafe. Winston testified there were occasions when "a small sale" of fifteen or twenty dollars was made when the purchaser did not have the money at the time. The purchaser was given a few days in which to pay. He stated, however, that an invoice would always be written and placed in the drawer. Winston knew nothing of appellant's transactions with Levrie. Leroy Sternberg and Ralph Delatorre, employees at the store, both testified that they had

customers who come back later to pay for items purchased. These payments were always made at the store and never off-premises.

Appellant testified that he held a position of trust with the company but denied he had any specific agreement regarding his employment. Appellant admitted that Levrie, using the name of Hector Montelongo, had obtained plumbing supplies from him. He reported that Levrie gave him a sad story about being broke and having a wife and kids and needing to finish a plumbing job in order to get paid. He claimed that "Montelongo" told him that the supplies could not be paid for until the job or jobs were completed, and since he worked all day, "Montelongo" made his payments in the evenings at the cafe. Appellant stated that he gave "Montelongo" the highest discount rate, "the P–3", and that he did not need permission from anyone to offer that discount. Appellant stated that after receiving the money, he later made out the necessary invoices and placed the money in the register. He did not understand why these invoices could not be found. He claimed his confession to Carter was not freely and voluntarily given.

### FIRST CONTENTION—EVIDENTIARY INSUFFICIENCY

■ Appellant urges that it was not shown he was a fiduciary as contemplated by the statute under which he was charged. In *Coplin v. State*, 585 S.W.2d 734, 735 (Tex. Crim.App.1979), the defendant asserted that the statutory definition of a fiduciary in section 32.45(a)(1)(B)—"any other person acting in a fiduciary capacity"—had to be construed narrowly as applying only to an individual associated with the fiduciaries enumerated in section 32.45(a)(1)(A)—"trustee, guardian, administrator, executor, conservator, and receiver." The *Coplin* court declined such a restricted interpretation, finding subsection (a)(1)(B) to have a plain meaning, subject to normal usage and applicable to anyone acting in a fiduciary capacity of trust (other than a commercial bailee). *See Coplin*, 585 S.W.2d at 735.

■ The essential term "fiduciary" is defined in the statute only self-referentially ("person acting in a fiduciary capacity"), and "commercial bailee" is not defined at all. *Talamantez v. State*, 790 S.W.2d 33, 35 (Tex. App.—San Antonio 1990, pet. ref'd). A statute is not unconstitutionally vague because the terms used therein are not specially defined. *Bynum v. State*, 767 S.W.2d 769, 774 (Tex.Crim.App.1989). When words in a statute are not defined, the words ordinarily are given their plain meaning unless the statute clearly shows that the words are used in some other sense. *State v. Garcia*, 823 S.W.2d 793, 798 (Tex.App.—San Antonio 1992, pet. ref'd). Words and phrases in a statute should be read in context and construed according to the rules of grammar and common usage. TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 1988) (Code Construction Act). Courts should not be involved in the business of redefining words used in an ordinary sense by the legislature. *See Bingham v. State*, 915 S.W.2d 9, 10 (Tex.Crim. App.1994).

■ "Fiduciary" has a common or plain meaning. *Showery v. State*, 678 S.W.2d 103, 107 (Tex.App.—El Paso 1984, pet. ref'd). Fiduciary has been defined as 'holding, held, or founded in trust or confidence.' *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 845 (1981). Simply, a fiduciary is one in whom another has justifiably reposed confidence to act in a certain manner. *Talamantez*, 790 S.W.2d at 35–36. The term is derived from the Roman law and means a person having a duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking. BLACK'S LAW DICTIONARY 625 (6th ed.1990).

■ The term "fiduciary capacity" is not defined in the statute. It, too, has a plain meaning. "One is said to act in a 'fiduciary capacity' or to receive money or contract a debt in a 'fiduciary capacity,' when the business which he transacts, or the money or property which he handles, is not his or for his own benefit, but for the benefit of another person as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part." BLACK'S LAW DICTIONARY 625 (6th ed.1990).

Clearly under the evidence, appellant was acting in a fiduciary capacity within the meaning of section 32.45 in effect at the time of the commission of the offenses. Appellant's initial contention is without merit.

## SECOND CONTENTION— EVIDENTIARY INSUFFICIENCY

■ Next, appellant urges that the trial court as the trier of fact erred in finding under the evidence that an agreement existed as required by statute. Section 32.45(a)(2), in effect at the time of the offenses, provided "(2) 'Misapply' means deal with property contrary to: (A) an agreement under which the fiduciary holds the property ..." Section 32.45 does indeed criminalize the conduct of a fiduciary who misapplies property contrary to a duty created either by agreement or law. *Bynum*, 767 S.W.2d at 775.

■ The statute in question did not define "agreement" so it must be given its common or plain meaning as noted earlier. An agreement is a harmonious understanding or an arrangement as between two or more parties, as to a course of action. *See Bynum*, 767 S.W.2d at 774–75. There is nothing in the applicable statute which required the agreement to be written. *See id.*; *Kline v. State*, 737 S.W.2d 895, 899 (Tex.App.—Houston [1st Dist.] 1987, pet. ref'd). Thus, appellant's contention that there was no written agreement and hence no violation of the statute is without merit. There was sufficient direct and circumstantial evidence to show that appellant and Craig Rosenstein had reached a harmonious understanding or arrangement as to appellant's duties as a store clerk or counter clerk both with regard to the handling of money and the control and access to the inventory. Appellant acknowledged that he held a position of trust and there was evidence that he trained others as store clerks. In fact, appellant testified that in his dealings with Levrie, he had acted in accordance with the duties imposed on him in his employment.

Viewing the evidence in the light most favorable to the trial court's judgment, we conclude that a rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offenses of misapplication of fiduciary property as charged. We overrule points of error one and two.

## RESTITUTION

■ In the third point of error, appellant contends that the trial court erred in ordering restitution as a condition of community supervision when there was no evidence to support that order. The records reflect that the complainant recovered all of the plumbing supplies involved in the offenses with which appellant was charged. Thus, the restitution of $10,901 was for losses independent of the charged offenses.

Craig Rosenstein testified that he made a claim to his insurance company for $44,000 and that the company paid him $10,901 less the $1,000 deductible provided by the policy. The full basis of the claim is not revealed. Rosenstein estimated his losses as a result of appellant's actions at $35,568. After the insurance company payment, he estimated the cost to replace the supplies taken by appellant would be approximately $24,667. In addition, he paid the investigator $7,851.38. Rosenstein explained that the "$35,000 figure" was an estimate based on what appellant told an investigator and on computer figures as to the variances in the inventory. He admitted that there had been a change in the computer systems used and there had not been a new inventory or outside audit.

Charles Carter, the investigator, testified that appellant orally told him that he (appellant) had been selling plumbing supplies for eighteen months at half-price and estimated the cost of the items at an average of $600 a week. Carter acknowledged that he had no other evidence that appellant had taken supplies independent of those alleged in the indictment. He had no witnesses, had not found any plumbing supplies at appellant's home or at the bar-cafe, and was unaware of bank accounts in appellant's name that contained large sums of money.

At the conclusion of the hearing, the trial court ordered restitution of $10,901 with the first thousand dollars to be paid to the complainant and $9,901 to be paid to "the Chubb Group of Insurance Companies."

■ It has been held that the decision to order restitution as a condition of community supervision or probation lies within the sound discretion of the trial court within the guidelines of the statute. This is true so long as the amount of restitution ordered has a factual basis in the record and is just. *See Martin v. State,* 874 S.W.2d 674, 676–77 (Tex.Crim.App.1994); *Cartwright v. State,* 605 S.W.2d 287, 289 (Tex.Crim.App.1980); *Todd v. State,* 911 S.W.2d 807, 816 (Tex. App.—El Paso 1995, no pet.). The difficulty presented is that the legislature has constantly amended the provisions of the adult probation or community supervision laws insofar as restitution is concerned. Some of the case law is not directly in point because the decisions were based in part on the legislative enactments as to restitution at the time of the offense in those cases. *Martin* held that restitution was limited by the applicable statute *to the victim of the crime* for which the defendant had been charged and convicted. *Martin,* 874 S.W.2d at 677; *see* Act of May 29, 1989, 71st Leg., R.S., ch. 785, § 4.17, 1989 Tex. Gen. Laws 3474, 3504–05 (since amended); *see also Ex parte Lewis,* 892 S.W.2d 4, 6 (Tex.Crim.App.1994). In *Gordon v. State,* 707 S.W.2d 626, 627–28 (Tex.Crim. App.1986), the defendant was charged with a civil rights violation causing death but was convicted of a lesser assault offense. There, the court found that the defendant could not be ordered to pay the funeral costs as these costs arose from an offense for which the defendant had not been found to be criminally responsible. *Gordon,* 707 S.W.2d at 630. *In re of D.S.,* 921 S.W.2d 860 (Tex.App.—San Antonio 1996, no writ), involved a juvenile delinquency proceeding. There, this court observed that the rules of restitution in criminal cases applied to juvenile proceedings, but also noted that the juvenile court was authorized to order restitution "[i]f a child is found to have engaged in delinquent conduct arising from the commission of an offense in which property damage or loss or personal injury occurred...." *In re D.S.,* 921 S.W.2d at 861 (quoting TEX. FAM.CODE ANN. § 54.041(b) (Vernon 1986)). Citing *Gordon* and *Martin,* this court found restitution could only be ordered where "property damage or loss or personal injury occur[s]" in the

offense for which the defendant is convicted. *Id.* The order of restitution was set aside. *Id.*

In the instant case, neither party cites the applicable statutory law or tries to apply it in their arguments for or against the restitution order.

In 1993, article 42.037 pertaining to restitution was added to the Texas Code of Criminal Procedure. Act of May 27, 1993, 73rd Leg., R.S., ch. 806, § 1, 1993 Tex. Gen. Laws 3207, amended by Act of May 29, 1995, 74th Leg., R.S., ch. 318, § 51, 1995 Tex. Gen. Laws 2734, 2749 (current version at TEX. CODE CRIM. PROC. art. 42.037 (Vernon Supp. 1997)). This new article addressed matters related to restitution orders in cases of probation, parole or mandatory supervision, although some of its language is inconsistent with the suspension of the imposition of sentence in probation cases. The same enactment, effective September 1, 1993, also amended article 42.12, section 11(a)(8) to read: "(8) Pay his fine, if one be assessed, and all court costs whether a fine be assessed or not, in one or several sums [, ~~and make restitution or reparation in any sum that the court shall determine~~];" Act of May 27, 1993, 73rd Leg., R.S., ch. 806, § 2, 1993 Tex. Gen. Laws 3207, 3209 (amended 1995). However, section 11(a)(8) of article 42.12 reappeared in another enactment in the same legislative session without recognition of the deletion in the other bill: "(8) Pay his fine, if one be assessed, and all court costs whether a fine be assessed or not, in one or several sums, and make restitution or reparation in any sum that the *judge* [~~court~~] shall determine." Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 4.01, 1993 Tex. Gen. Laws 3586, 3725 (amended 1995) (current version at TEX.CODE CRIM. PROC. art. 42.12, § 11); *see also Martin,* 874 S.W.2d at 676 n. 5.

■ The above described 1993 enactments, applicable to the instant case since the offenses occurred in April 1994, lie between the statutory provisions mentioned in the later case decisions and the current law. *See* TEX.CODE CRIM. PROC. ANN. art. 42.037 (Vernon Supp.1997); TEX.CODE CRIM. PROC. ANN. art. 42.12, § 11(b) (Vernon Supp.1997). Article 42.12, section 11(a)(8) as enacted by

chapter 900, being the latest expression of the legislative will of the 73rd Legislature, would appear to give the trial court broad discretion in the matter of restitution. However, it is a general statute when compared to the special and thus controlling statute, article 42.037, dealing specifically with restitution. *See Huynh v. State,* 901 S.W.2d 480, 483 (Tex.Crim.App.1995); *Garza v. State,* 687 S.W.2d 325, 330 (Tex.Crim.App.1985) (stating general rule that specific statute controls over general statute). A reading of the 1993 version of article 42.037(b)(1), (c)(1), (f)(1), clearly shows that restitution is limited to the *results* of the offense or offenses charged, and that restitution must be made only to the *victim,* except that in the interest of justice, restitution may be made to a person who has compensated the victim for the loss to the extent the person paid compensation.

The results of the offenses charged were recovered and under the applicable law no restitution was due the victim. The restitution order was improperly entered. Moreover, the restitution order was based solely on the insurance company's payment to the victim with the bulk of the payment awarded to a non-victim of the offenses charged and without a sufficient showing that the insurance company's payment were even based on appellant's actions. The trial court's restitution is hereby ordered deleted from the judgment and the order granting community supervision. *See Ex parte Pena,* 739 S.W.2d 50, 51 (Tex.Crim.App.1987); *In re D.S.,* 921 S.W.2d at 861.

### *ANOTHER MATTER*

There is another matter revealed by this record which the parties have not addressed. The first three counts of the indictment charged separate third-degree felonies of misapplication of fiduciary property on April 10, 16, and 24, 1994. The fourth count of the indictment alleged a third-degree felony theft of property of the aggregate value of $750 or more but less than $20,000 obtained pursuant

to one scheme or continuing course of conduct. *See* Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 932, amended by Act of May 29, 1993, 73rd Leg., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586 (current version at TEX. PENAL CODE ANN. § 31.09 (Vernon 1994)).[5] As obvious from the face of the fourth count and as explained to the trial court by the prosecutor, the fourth count alleged as misdemeanor thefts the very same incidents made the subject matter of the first three counts of the indictment and then aggregated the amounts in order to charge a third-degree felony theft under section 31.09 then in effect.[6]

The entire indictment was read to appellant and he entered a plea of not guilty. During the guilt/innocence stage of the trial, the focus of the prosecution was not on the allegations of the fourth count. The trial court announced that it found appellant "guilty of all counts." At the penalty stage of the trial, the trial court informed appellant that he had been found "guilty on all three counts," and the prosecutor repeatedly stated that appellant had been found "guilty of three third-degree felonies." It appears that the reference was to the first three counts of the indictment. Later, the trial court inquired whether the sentences would have to run concurrently since the offenses were prosecuted in one trial; the prosecutor responded in the affirmative. *See* Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 891 (amended 1993 and 1995) (current version at TEX. PENAL CODE ANN. § 3.03 (Vernon Supp.1997)). The trial court then assessed punishment at "six years in the Texas Department of Corrections Institutional Division and placed him on probation for a period of ten years." No reference was made to counts.

The formal judgment, signed by a judge other than the trial judge reflects: "Offense convicted of: FIDUCIARY MISAPP— $200—$10000." The body of the judgment shows appellant entered a plea of not guilty

---

5. The 1993 amendments left the former law unchanged.

6. It appears that the prosecution choose to use said section 31.09 rather than the similar provisions of section 32.03 then in effect found in

Chapter 32 of the Penal Code. *See* Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. laws 883, 934 (amended 1993) (current version at TEX. PENAL CODE § 32.03 (Vernon 1994)).

"to FIDUCIARY MISAPP—$200—$10000" and that the trial court found appellant "guilty of the *offense* stated above." No mention of a conviction for theft is found in the judgment.[7] The appeal bond reflects only *a* conviction for "the felony offense of Fiduciary/Misapp—20–10,000," and the appellate briefs of both parties refer only to a conviction for misapplication of fiduciary property. No mention is made of a conviction for theft, if any. In light of the record before us, we reform the judgment to reflect convictions for the first three counts of the indictment, each charging misapplication of fiduciary property of the value of $200 or more but less than $10,000, and the suspension of the imposition of the sentences for each conviction. If there was a conviction for the offense of theft as alleged, we do not find that punishment was assessed and a proper judgment entered as to that offense.

Under these circumstances, we are not confronted with the question of reviewing, in the interest of justice, as unassigned error[8] the issue of whether the double jeopardy provisions of the federal and state constitutions would bar the theft conviction and any punishment therefor since the theft offense was based on the same incidents or offenses as in the first three counts of the indictment. *See* U.S. CONST., amend. V; TEX. CONST. art. I, § 14; TEX.CODE CRIM. PROC. ANN. art. 1.10 (Vernon 1977).

As reformed, the judgment is affirmed.

---

7. The judgment does contain the uncertain phrase "CHARGING INSTRUMENT: COUNT I, II, III, IV, OF THE INDICTMENT." There is no other reference that appellant was convicted on each count or for theft.

8. *See Lopez v. State,* 708 S.W.2d 446, 448–49 (Tex.Crim.App.1986); *Barney v. State,* 698 S.W.2d 114, 123 (Tex.Crim.App.1985); *Carter v. State,* 656 S.W.2d 468, 468–70 (Tex.Crim.App. 1983); *State v. Lara,* 924 S.W.2d 198, 201 n. 3 (Tex.App.—Corpus Christi 1996, no pet.).