

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00151-CR

---

ELI MADISON III                                                    APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY
TRIAL COURT NO. 1400759D

----------

## MEMORANDUM OPINION[1]

----------

Eli Madison III appeals his first-degree felony conviction for misapplication

of fiduciary property valued over $200,000.  *See* Tex. Penal Code Ann. § 32.45

(West Supp. 2017).[2]  In three issues, he argues that the evidence is legally

---

[1]*See* Tex. R. App. P. 47.4.

[2]Madison's indictment alleged that he had committed misapplication of fiduciary property valued at more than $200,000 from 2007 until 2009.  In 2015, the legislature amended section 32.45 of the penal code to require a misapplication of an amount over $300,000, rather than over $200,000, for a first-

insufficient to support his conviction, that the trial court committed fundamental error by allowing Jeanette Hanna to testify because she is an employee of the Tarrant County District Attorney's Office, and that the trial court should have excluded Charles Clemons's testimony because he was not authorized to testify on behalf of Bank of America. Because we conclude that the State presented sufficient evidence to support Madison's conviction and that he forfeited his appellate complaints about the evidence presented by Hanna and Clemons, we affirm the trial court's judgment.

## Background Facts

Madison was a long-time member of Pilgrim Valley Missionary Baptist Church. Since 1970, the church was a beneficiary of the Pilgrim Valley Manor Housing Trust, of which the principal asset was an apartment complex known as Pilgrim Valley Manor Apartments. Around 2005, the Housing Trust had only one active member—Velmeta Washington—on its board of trustees. Washington needed help on the board of trustees, so she recruited Madison, whom she believed to be trustworthy and whose business acumen she believed would be an asset. By early 2007, the apartments had become insolvent, and the church authorized Madison and Washington, as trustees for both the Housing Trust and the church, to sell the apartments.

---

degree felony. *See* Act of May 31, 2015, 84th Leg., R.S., ch. 1251, § 21, 2015 Tex. Sess. Law Serv. 4208, 4217 (West).

2

The Housing Trust sold the apartments and ultimately received $558,433.12, which was deposited into a bank account (the Apartments Fund) with Bank of America and which remained separate from the church's standard operating account with Chase Bank. The Apartments Fund was held in the name of the church with two authorized signatories—Madison and Washington—each of whom were titled as "trustee."

Not long after the sale, Madison began a series of transactions that ultimately led to his indictment. He began to transfer money from the Apartments Fund to his own business and personal accounts. At first, he refunded the money with a small addition so that he was increasing the Apartments Fund. Ultimately, however, his withdrawals became larger and his deposits smaller, so that by December 2009, he had effectively withdrawn a total of $786,689.90 and had returned a total of $442,650.44, leaving a debt to the church in the amount of $344,039.46.

Another member of the church learned about the increasingly depleted balance of the Apartments Fund when Bank of America accidently gave her a statement of the account. The chairman of the church's board of trustees presented this information to the board at a meeting in November 2009, where Madison initially defended himself by claiming that the bank must have made an error by charging the church's accounts instead of his own accounts also held at Bank of America. The church's board of trustees directed the signatories on the account—Madison and Washington—to not spend any more money from the

3

account.  The church initially gave Madison time to repay the money, but after he failed to keep up with his payments, the church initiated a civil lawsuit against him, for which a court granted a monetary judgment in the church's favor.

Following the civil judgment, Clemons, a member of the church and an employee of Bank of America, brought the matter to the attention of the district attorney's office.  A grand jury indicted Madison for misapplication of fiduciary property.  After considering the parties' evidence and arguments, a jury found him guilty of misapplication of fiduciary property over $200,000 and assessed his punishment at six years' confinement.  He appealed.

## Legal Sufficiency

In his first issue, Madison argues that the State failed to present sufficient evidence to support his conviction.  He contends more specifically that the State failed to present sufficient evidence to show that he had any agreement with the church about how to use the money, to show that he misapplied property in excess of $200,000 because the statute of his offense does not allow for an aggregation of individual transactions, and to show that he had the requisite mental state to intentionally or knowingly misappropriate property.  The State replies that Madison knew how he was to manage the money, the knowledge of which would be sufficient to constitute an "agreement" pursuant to section 32.45; that section 32.45 allowed for aggregation of Madison's individual transactions, which would bring the value of transactions to over $200,000; and that the State

4

presented evidence to show that Madison intentionally misappropriated the church's property.

**Standard of review**

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any

5

conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

**The agreement**

Madison first argues that the State failed to produce sufficient evidence to show that he had an agreement with the church or its board of trustees about how to manage the Apartments Fund. He supports his contention by asserting that Maverick Gayden, the church's pastor, testified that there were no bylaws in effect at the time the money was deposited into the Apartments Fund and that both Gayden and Madison himself testified that Madison had had no contract with the church about how to manage the funds. The State, in response, contends that no formal agreement was necessary and that Madison conducted himself in a manner that proved the existence of an agreement.

Section 32.45 provides that a person commits an offense if he "intentionally, knowingly, or recklessly[3] misapplies property he holds as a fiduciary . . . in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held." Tex. Penal Code Ann. § 32.45(b). The statute defines "fiduciary" to include, among others, a trustee. *Id.* § 32.45(a)(1)(A). "Misapply" is defined, in part, as dealing with

---

[3]Madison's indictment alleged only intentional or knowing mental states.

6

property contrary to an agreement under which the fiduciary holds the property. *Id.* § 32.45(a)(2)(A). Under section 32.45, the State is not required to prove how the fiduciary applied the funds; rather, the State must only prove "that the fiduciary failed to apply the funds according to the terms of the agreement." *Little v. State*, 699 S.W.2d 316, 318 (Tex. App.—San Antonio 1985, no pet.).

Under section 32.45, an "agreement" is "a harmonious understanding or an arrangement, as between two or more parties, as to a course of action." *Bynum v. State*, 767 S.W.2d 769, 777 (Tex. Crim. App. 1989). The agreement does not need to be in writing, nor must witnesses testify "we agreed"; rather, an agreement may be proved by direct or circumstantial evidence. *Id.* Even if a written agreement exists, subsequent oral discussions may alter or clarify that agreement. *See Hunt v. State*, Nos. 05-16-00558-CR, 05-16-00559-CR, 05-16-00604-CR, 05-16-00605-CR, 05-16-00606-CR, 2017 WL 3276007, at *5 (Tex. App.—Dallas Aug. 1, 2017, no pet.) (mem. op., not designated for publication) (holding that although a written agreement appeared to give the defendant full authority to invest property as he pleased, subsequent oral discussions with the owner of the property indicated an agreement to limit the defendant's transactions to certain types of investments).

Evidence suggesting the existence of an agreement includes an oral or written understanding of certain goals and purposes for the property. *See Natho v. State*, No. 03-11-00498-CR, 2014 WL 538787, at *3–4 (Tex. App.—Austin Feb. 6, 2014, pet. ref'd) (mem. op., not designated for publication); *Keene v.*

7

*State*, No. 04-11-00661-CR, 2013 WL 2644556, at *3 (Tex. App.—San Antonio June 12, 2013, no pet.) (mem. op., not designated for publication). Such evidence also includes the existence of established policies for the defendant to follow and the defendant's knowledge of those policies. *See Gonzalez v. State*, 954 S.W.2d 98, 104 (Tex. App.—San Antonio 1997, no pet.)*; Martinez v. State*, No. 08-13-00363-CR, 2016 WL 2864952, at *2–3 (Tex. App.—El Paso May 13, 2016, no pet.) (not designated for publication). The existence of an agreement may also be shown by the defendant conducting himself in a manner connoting an agreement. *See Gonzalez*, 954 S.W.2d at 104. Finally, an agreement may be shown by attempts by the fiduciary to obfuscate the manner in which he is handling the property, thereby implying his knowledge of the proper application of the property. *See Martinez*, 2016 WL 2864952, at *2–3.

Madison's reliance on Gayden's testimony to show the non-existence of an agreement is misplaced. First, Gayden did not testify that there were "no bylaws in effect at the time the money was deposited into the [Apartments Fund] under [Madison's] control," as Madison argues in his brief. Although Gayden testified that the bylaws drafted in October 2007 were not ratified by the church until a business meeting in 2008, he specifically denied knowing whether any other bylaws were already in effect before the ratification. Second, the bulk of Madison's withdrawals occurred after the ratification of the October 2007 bylaws. Third, testimony that the church's board of trustees had no written contract with

8

Madison also does not help him because section 32.45 only requires an agreement—not a formal written contract. *See Bynum*, 767 S.W.2d at 777.

Considering the evidence in the light most favorable to the verdict, there is sufficient evidence to support the jury's implicit finding that an agreement existed between Madison and the church. Three witnesses testified that the purpose of the Apartments Fund was to keep money in reserve to protect the solvency of the church or for emergency purposes, which Madison confirmed in a trustee report that he drafted. The State produced evidence that the church's bylaws and practices required approval from the church's membership through its board of trustees to authorize expenditures from church accounts.

Three witnesses all agreed that they had not given Madison authority to transfer the church's money to his personal accounts. Witnesses testified further that Madison understood that the money belonged to the church and that he did not have the authority to spend it without prior approval. Madison admitted that he understood that it was inappropriate to comingle the church's money with his personal money, that he had an agreement as a signatory on the account to spend the money as directed by the church's board of trustees, and that he had an implicit agreement with the members of the church to protect its funds.

Finally, the State presented evidence that Madison had attempted to obfuscate the handling of the funds by showing that he had not told the board of trustees about the expenditures on the Apartments Fund. The jury, which had the responsibility to resolve conflicts in the testimony, to weigh the evidence, and

9

to draw reasonable inferences, could have reasonably believed that Madison had an agreement with the church. The State produced evidence indicating that he knew that the church wanted to reserve the Apartments Fund to keep the church solvent, that he had an agreement with the church or its board of trustees to not spend money without approval of the church, that nobody authorized him to transfer the funds to his personal accounts, and that he attempted to shift the blame onto Bank of America and otherwise hide the expenditures on the account.

We conclude that the evidence, when viewed in the light most favorable to the jury's verdict, supports the existence of an agreement under which Madison managed the church's property. Tex. Penal Code Ann. § 32.45(a)(2)(A); *Jackson*, 443 U.S. at 319. Thus, we overrule Madison's first issue to that extent.

**Value over $200,000**

Madison also argues in his first issue that section 32.45 does not allow the State to rely on a "continuing scheme or course of conduct" to aggregate his individual transactions into a single offense of misapplication of property over $200,000. The individual amounts that he transferred from the Apartments Fund to his personal accounts were less than $200,000 each.

Section 32.03 of the Penal Code provides that "[w]hen amounts are obtained *in violation of this chapter* pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade

10

of offense." Tex. Penal Code Ann. § 32.03 (West 2016) (emphasis added). In other words, section 32.03 specifically allows section 32.45 transactions to be aggregated and treated as one offense. *Id.*; *see State v. Castorena*, 486 S.W.3d 630, 633 (Tex. App.—San Antonio 2016, no pet.).

The State's expert witness, Hanna, presented a detailed accounting for the money initially added to the Apartments Fund ($558,433.12), Madison's transfers to and from the Apartments Fund, and how he ultimately owed $344,039.46 to the Apartments Fund. Based on Hanna's testimony and the related exhibits, a rational jury could have found that Madison misapplied an aggregated amount of $344,039.46 of the Apartments Fund. Therefore, we overrule Madison's first issue to the extent that Madison argues that the State failed to produce sufficient evidence to show an aggregated value over $200,000.

**Madison's intent**

Madison's last contention regarding the legal sufficiency of the evidence is that the State failed to demonstrate that he had the requisite intent to commit an offense under section 32.45. Madison supports this proposition by noting that he repeatedly reimbursed the Apartments Fund, that he intended to reimburse the entire amount that he borrowed from the Apartments Fund, and that his intent in borrowing the money was to earn a profit for the benefit of the church. He seems contend that he did not intend to misapply the church's property because his use of the money was to benefit the church. The State asserts that even if Madison intended to borrow money from the Apartments Fund to earn money for the

11

church and to repay the full amount that he had borrowed, section 32.45 only requires a showing that he intentionally or knowingly managed the Apartments Fund in a manner that involved a substantial risk of loss of the church's money.

In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). "Intent may . . . be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

Section 32.45 requires that a person intentionally, knowingly, or recklessly (1) misapplies property (2) that he holds as a fiduciary (3) in a manner that involves substantial risk of loss to the owner of the property. Tex. Penal Code Ann. § 32.45(b). Restated, the question here is whether the State provided sufficient evidence to prove beyond a reasonable doubt that Madison intentionally or knowingly (the mental states alleged in the indictment) used the church's money contrary to an agreement that he had with the church in a manner that involved a substantial risk of loss.

The State, as discussed above, presented sufficient evidence to convince a jury beyond a reasonable doubt that Madison intentionally and knowingly transferred church funds meant to maintain the solvency of the church to his

12

personal accounts without authorization from the church's board of trustees. Even if a jury believed Madison's contention that he intended to pay the church back with interest higher than it was receiving in the bank account, Madison still misapplied the church's property contrary to his agreement. In other words, even if Madison had repaid everything that he had borrowed with interest above that which the bank was paying, a jury could still have found that he had intentionally or knowingly misapplied the church's property simply because it was against the agreement in which it was held, regardless of the benefit his usage of the property may have had for the church.

Furthermore, the State has produced evidence that Madison's use of the property involved a substantial risk of loss. First, Madison's withdrawals decreased the amount of interest that the money could have earned by being left in the Apartments Fund—from about $1,500 per month in late 2007 down to about $20 per month in late 2009. Second, Madison transferred the church's money to business and personal accounts, which carried a significant amount of debt. Third, the jury, weighing the evidence, could have concluded that Madison's transfers to his own business, personal, and family accounts made it more likely than not that the church would not be reimbursed. In short, the jury could have believed beyond a reasonable doubt that Madison intentionally or knowingly transferred the church's money contrary to an agreement he had with the church in a manner that involved a substantial risk of loss.

13

Because we conclude that the State produced sufficient evidence to convince the jury beyond a reasonable doubt that Madison intentionally or knowingly used the church's property contrary to an agreement that he had with the church in a manner involving a substantial risk of loss of over $200,000, we overrule the remainder of Madison's first issue.

**Hanna's Testimony**

In his second issue, Madison contends that the trial court committed fundamental error by allowing Hanna to testify on behalf of the State as an expert witness—a financial analyst—because she was an employee of the Tarrant County District Attorney's Office.  He argues that Hanna's testimony violated rule 3.08 of the Texas Disciplinary Rules of Professional Conduct.  *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.08, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West 2013).  Madison concedes that he made no objection at trial to Hanna's testimony.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.  Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1461 (2016).  Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule.  Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d

14

259, 262–63 (Tex. Crim. App. 2013). We should not address the merits of an issue that has not been preserved for appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

Most complaints, "whether constitutional, statutory, or otherwise, are forfeited by failure to comply with Rule 33.1(a)." *Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004). But Rule 33.1's preservation requirements do "not apply to rights which are waivable only or to absolute systemic requirements, the violation of which may still be raised for the first time on appeal." *State v. Dunbar*, 297 S.W.3d 777, 780 (Tex. Crim. App. 2009). Waivable rights are rights of litigants that must be implemented by the judicial system unless expressly waived. *Mendez,* 138 S.W.3d at 340. Absolute rights are rights that are widely considered so fundamental to the proper functioning of our adjudicatory process that they cannot be forfeited by inaction alone. *Garza v. State*, 435 S.W.3d 258, 260 (Tex. Crim. App. 2014).

We have not treated alleged violations of rule 3.08 as involving waivable or absolute rights; to the contrary, we have applied rule 33.1's preservation requirements in this exact circumstance. *See Mieth v. State*, No. 02-05-00121-CR, 2006 WL 563245, at *6 (Tex. App.—Fort Worth Mar. 9, 2006, no pet.) (mem. op., not designated for publication) ("[T]he only objections that Mieth's defense counsel made during [an assistant district attorney's] testimony were that the evidence was irrelevant and immaterial. These objections did not preserve his complaint regarding any alleged violation of Texas Rule of Disciplinary Conduct

15

3.08."); *see also Nelson v. State*, No. 05-16-00494-CR, 2017 WL 2334237, at *12 (Tex. App.—Dallas May 30, 2017, no pet.) (mem. op., not designated for publication) (applying rule 33.1 to an alleged violation of rule 3.08); *Hampton v. State*, No. 12-02-00272-CR, 2003 WL 1563557, at *2 (Tex. App.—Tyler Mar. 25, 2003, no pet.) (mem. op., not designated for publication) (same).  In fact, the record shows that when the State asked the trial court to allow Hanna to testify as an expert witness, Madison's counsel stated, "I've reviewed her qualifications. I have no objection."  Madison's affirmative statement that he had no objection to Hanna's testimony further supports our conclusion that he forfeited his second issue.  *See Holmes v. State*, 248 S.W.3d 194, 200 (Tex. Crim. App. 2008) (holding that when a defendant affirmatively states "no objection" upon the introduction of evidence, the defendant forfeits any complaint about the admissibility of the evidence); *O'Neal v. State*, No. 02-16-00217-CR, 2017 WL 3634230, at *1–2 (Tex. App.—Fort Worth Aug. 24, 2017, no pet.) (mem. op., not designated for publication) (citing *Holmes* and applying the "no objection" rule).

Because Madison failed to object to Hanna's testimony at trial, he failed to preserve his complaint.  *See* Tex. R. App. P. 33.1(a)(1).  Therefore, we overrule his second issue.

### Clemons's Testimony

In his third issue, Madison contends that the trial court should have excluded Clemons's testimony about Bank of America's policies and procedures because the bank did not authorize Clemons to testify on its behalf.  Madison

16

argues that the trial court erred by overruling both his objection and the bank's objections to Clemons's testimony. Although he recognizes that he "can find no specific case authority for such a situation," he contends that a "corporate entity has a right to designate its corporate representative and can object thereto[,] and therefore [Clemons's] testimony should have been excluded." The State contends, in part, that Madison did not preserve this complaint for our review.

To preserve error under rule 33.1, a party's complaint raised on appeal must comport with its complaint made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). Additionally, a party may not rely on a complaint made by another party—each party must either voice his own complaint or adopt the complaint made by another party. *See Martinez v. State*, 833 S.W.2d 188, 191 (Tex. App.—Dallas 1992, pet. ref'd); *see also Brown v. State*, No. 01-14-00026-CR, 2015 WL 5136845, at *4 (Tex. App.—Houston [1st Dist.] Sept. 1, 2015, pet. ref'd) (mem. op., not designated for publication) (explaining that a defendant is responsible for "voicing his own objection").

Madison's argument on appeal is that the trial court should have excluded Clemons's testimony because Bank of America did not authorize Clemons to testify. His objection at trial, however, was that Clemons "did not have authority to do anything in that bank and turn anything over to the church, which was basically criminal from—could have been criminal from their standpoint because he violated privacy by taking information." Madison further explained,

17

> The bank has their attorneys here that have articulated that they did [not] give [Clemons] authority to take any paperwork. . . . And then to turn that . . . stuff over to the State of Texas, which is what he did, *and I am objecting to him testifying because that is improper for him to come in here by taking information that he had no authority to have and then try to bring it into the courtroom to run it against my client.* I'm objecting to that. [Emphasis added.]

Madison also objected three times to a line of questions regarding whether Clemons could state that he believed Madison was lying during a previous conversation, all three of which were overruled. The judge sustained two of Madison's other objections: one concerning whether Clemons could testify about whether an explanation previously made by Madison "made sense" and another concerning whether Clemons could discuss that explanation further even though it was unrelated to Clemons's investigations into the church's bank accounts. Madison's final objection during Clemons's testimony was whether Clemons could testify about why Madison remained a member of the church, which the court allowed Clemons to answer.

None of these objections, all of which were made by Madison's counsel, related to whether Clemons's testimony should have been excluded because he was not authorized to testify on behalf of Bank of America. And while Evan Moeller, an attorney for Bank of America who was present at the proceedings but not a party to the trial, objected to Clemons's testimony on the ground that Clemons now complains about, Clemons did not adopt Moeller's objection or otherwise urge that objection at trial. *See Martinez*, 833 S.W.2d at 191.

18

Because Madison cannot rely on Moeller's objections to preserve error and because Madison's present complaint does not comport with his objections at trial, he failed to preserve his complaint. *See* Tex. R. App. P. 33.1(a)(1); *Clark*, 365 S.W.3d at 339. Thus, we overrule Madison's third issue.

## Conclusion

Having overruled all three of Madison's issues, we affirm the trial court's judgment.

/s/ Kerry Fitzgerald
KERRY FITZGERALD
JUSTICE

PANEL: SUDDERTH, C.J.; MEIER, J.; and KERRY FITZGERALD (Senior Justice , Retired, Sitting by Assignment).

SUDDERTH, C.J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: January 18, 2018