

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-11-00513-CR

Bruce Randol **MERRYMAN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2011-CR-0310
Honorable Mary Roman, Judge Presiding[1]

Opinion by:    Phylis J. Speedlin, Justice

Sitting:        Phylis J. Speedlin, Justice
               Rebecca Simmons, Justice
               Steven C. Hilbig, Justice

Delivered and Filed:  November 30, 2012

AFFIRMED

      Bruce Randol Merryman appeals his convictions on three counts of misapplication of fiduciary property and three counts of theft by deception arising out of several construction contracts he entered into with different complainants. Merryman challenges the legal sufficiency of the evidence to support his convictions, as well as the sentences imposed for Counts I and II

---

[1] The Honorable Mary Roman is the presiding judge of the 175th Judicial District Court, Bexar County, Texas, and signed the six judgments entered in this case. However, the Honorable Thomas F. Lee, a visiting judge, presided over the trial.

based on an elderly victim; he also complains about the trial court's response to the jury's questions during punishment deliberations. We affirm the trial court's judgments.

### FACTUAL AND PROCEDURAL BACKGROUND

Bruce Merryman was a general contractor doing business through his company Care Construction Service. The criminal charges in this case arise out of Merryman's conduct with respect to several construction projects he undertook during 2008 and 2009, pursuant to which he obtained a series of advance payments from the customers before failing to complete each project. Merryman claimed he quit each job due to a contract dispute; the State claimed he never intended to finish the jobs and acted pursuant to a scheme to misappropriate the customers' money.

Each of the customers signed a written contract prepared by Merryman.[2] Each contract was substantially the same, except for the specific construction work to be performed. The contract price covered materials and labor for the job, subject to written change orders for any additions or alterations to the job. Each contract required a down payment to be paid in full at signing, and required subsequent payments each week during the job regardless of work progress; the final payment was due in full upon completion and inspection; with respect to change orders, payment for the additional work was due at the time of the change order. The contracts provided that if the owner failed to timely make any payment due under the contract, Merryman could stop work pending payment; the contracts also stated that if a failure to make payment continued for more than five days, it would be deemed a material breach of the contract and Merryman could start another job as well as place a lien on the customer's home or business for non-payment.

---

[2] The contracts were admitted into evidence at trial.

The second page of each contract set out Merryman's obligations, including that all work was to be completed in a workman-like manner in compliance with applicable building codes, and that Merryman as contractor was obligated to obtain all necessary permits. The contracts further stated that Merryman was authorized to hire subcontractors to perform the work, and was obligated to pay them in full, but that he remained responsible for "the proper completion of the contract." Finally, Merryman agreed to remove all debris and leave the premises "in broom clean condition."

The first of Merryman's customers to file a criminal complaint were Richard and Fangwen ("Wendy") Clifton who contracted with Merryman to build a hair salon in a strip center. Although they paid him the full contract price, he had only completed 10 to 15% of the project after six months; they ended up firing Merryman and hiring another contractor to finish the job. After an investigation revealed other customers with similar experiences, Merryman was indicted for misapplication of fiduciary property and theft by deception in connection with each customer's project. Each count alleges Merryman collected the payments "pursuant to one scheme or continuing course of conduct;" therefore, the amounts paid by the complainant are aggregated in each count. Merryman pled not guilty and proceeded to a jury trial.

The following evidence was presented on each count during trial:

*Count I (Richard Clifton):  Misapplication of Fiduciary Property ($20,000 - $100,000)*
*Count II (Richard Clifton):  Theft ($20,000 - $100,000)*

At trial, Richard Clifton testified that he and his wife Wendy obtained three bids for building out a hair salon in the space they were renting in a strip center, and chose Merryman's bid. They signed a contract prepared by Merryman on February 1, 2008, and paid him $8,000 as a down payment that day as called for by the contract. The total contract price for the project was $44,970. The contract stated a start date of February 25, 2008, but Merryman did not show

up at the site that day. When Clifton called him, Merryman said there was a delay of two weeks and demanded they pay an additional $7,010 under a change order Merryman had written up. Clifton testified they asked for a refund of their $8,000, but Merryman refused and threatened if they did not pay the additional $7,010 by the next day, he would move on to a new job. The Cliftons paid Merryman $7,010 on February 26, 2008. Merryman did not start their job until April 14, three days after the contractual completion date. As the weeks went by, and minimal work was done on the project, Merryman kept demanding payment installments under the contract, as well as additional payments for change orders that Clifton testified they never requested. Clifton stated that he asked Merryman to show him receipts for the materials he had ordered and the expenses he had incurred, but Merryman never showed him any receipts. In addition, Merryman hired subcontractors to do some of the plumbing and electrical work, but some of the subcontractors told Clifton they could not work because they had not been paid by Merryman.

The Cliftons ended up paying Merryman a total of $48,360, the full contract price plus over $3,000 extra for change orders. They eventually fired Merryman in August 2008 when only 10% of the project had been completed and the quality was below average; most of that work had only been done after the final contract payment in May. Photos of the unfinished project were admitted into evidence. Richard Clifton further explained that they fired Merryman because he "did not show up for work," dragged the project out and lied, and "every time there was a payment [due], there was a threat behind it." Clifton testified that Merryman "used the contract as a threat," repeatedly warning them if they did not pay each weekly installment he could walk away, keep the money, and start another job under the terms of the contract. Clifton stated he and Wendy had trusted Merryman with their money, and believed he had deliberately

and purposefully defrauded them and misapplied their money. Clifton said they made it clear to Merryman they needed the hair salon built quickly because they were already paying $2,750 in monthly rent for the space in the strip center; he stated they made no changes to the project and wanted no delays; they signed the change orders Merryman presented to them "under duress."

Further, Clifton testified the work that Merryman did perform on the hair salon was not of a good workmanlike quality as required by the contract. The new general contractor hired by the Cliftons to finish building the hair salon, David Dorrough, testified that the project was only about 10% complete and he had to re-do substandard framing and drywall work. Dorrough was able to complete the salon in eight weeks, including two weeks spent obtaining the permits. The Cliftons paid Dorrough approximately $30,000 to complete the project, in addition to the $48,360 they had paid Merryman.

One of the subcontractors hired by Merryman, Dane Menear who owned a plumbing business, testified that Merryman did not fully pay him for the work he did on the hair salon; Merryman's payment was about $2,000 short. Menear stated that Merryman told him to stop working on the Clifton project due to a lack of funds. Menear was surprised to later learn from the Cliftons that they had paid Merryman a total of $48,000. The Cliftons ended up contracting directly with Menear to finish the plumbing work for an additional $5,500.

Finally, the investigating officer testified about Merryman's bank records, which were admitted into evidence. He stated that, based on his calculations, Merryman used only $7,515 of the $48,360 paid by the Cliftons for expenses related to their project. Merryman's bank records showed that the other 85% of the Cliftons' payments were used to pay for his own household expenses; the payments were in the form of checks made payable to Care Construction Service, not to Merryman personally. The records showed that Merryman deposited his customers'

payments in his business account, sometimes withholding cash from the deposits, and then used the account to pay for his family's personal living expenses, including his own house payment and property taxes, utilities, cable television, groceries, restaurant meals, airfare, clothing, newspaper subscription, movie theater tickets, etc. The bank records revealed that Merryman had minimal amounts of other money coming in as deposits to his business account; in fact, the account was often overdrawn. On the day Merryman deposited the Clifton's first payment of $8,000, the account had a balance of $25; when he deposited the next payment of $7,010 three weeks later, the majority of that money was gone leaving a balance of $847 in the account. The investigating officer testified the bank records showed "a pattern of behavior on the part of the defendant, Mr. Merryman, that he was using the contract with the Cliftons as an operating account for his household, and when he was almost out of money, he would come back to the Cliftons and say you are under contract with me, you have to pay me, and get more money."

### Count III (Lois Morgado): Misapplication of Fiduciary Property ($20,000 - $100,000) Count IV (Lois Morgado): Theft ($1,500 - $20,000)

Lois Morgado testified she hired Merryman to build an addition to her home for a total contract price of $64,980. Morgado paid Merryman $10,830 on May 15, 2009 when she signed the contract, and paid him the next installment of $10,830 two weeks later on June 1, 2009, even though she was hesitant because so little work had been done. When Merryman demanded the third payment of $16,245 one week later, Morgado refused because Merryman had done very little work for the money she had already paid him. She stated the $21,660 she had paid was supposed to cover the demolition work plus a new slab and new sheetrock. He had begun the demolition, tearing down sheetrock and part of the roof, but had not finished the demolition; no construction materials were on site and no construction work had been started. When Morgado questioned Merryman about the lack of progress, he claimed that he could not begin the project

without the permits. Morgado testified it was Merryman's obligation to obtain the necessary permits under the terms of the contract, and there was other work he could have done on the project until he got the permits.

When Morgado refused to make any further payments until more work was done, Merryman became "very mean" and "very threatening," stating that a check was due every week according to the contract, and threatening to walk off the job and put a lien on her house if she did not immediately make the next payment. When Morgado confirmed she would not make the third payment without more work being done, Merryman walked off the job, leaving the roof torn off and sheetrock exposed to the elements and debris on the property. Morgado testified that once Merryman received her first check, "his whole attitude changed" and he became harder to reach, failing to return her calls and ignoring her emails and text messages. Merryman retained the full $21,660 paid by Morgado. She testified she had trusted him with her money, but that he did not do $21,660 worth of work. Morgado stated she had experience working with contractors, both in her business and personal life, but in this case she felt deceived and believed Merryman had committed theft against her; he held her to the payment schedule in the contract, but did not do the work he was supposed to do under the contract. Photos were admitted into evidence of the unfinished project. The detective who investigated Morgado's criminal complaint testified to his opinion that $20,000 worth of work was not done on Morgado's property. Finally, Morgado testified she had to hire a new contractor to complete the project.

> ***Count V (Stephen Dodwell <u>and/or</u> Dominic & Rosalinda Costa):***
> ***Misapplication of Fiduciary Property ($1,500 - $20,000)***
> ***Count VI (Stephen Dodwell <u>and/or</u> Dominic & Rosalinda Costa):***
> ***Theft ($1,500 - $20,000)***

Dominic Costa testified he contracted with Merryman on July 14, 2008 to repair fire damage to his home, and he and his wife paid the $3,803 down payment that day. Costa stated

he timely paid the next installment of $4,154 even though very little work had been done. When the next installment came due one week later, Costa told Merryman he was holding the check until he got more work done; Merryman said Costa was delaying the job by not giving him the next check. Costa paid Merryman the next $4,154 installment a few days later. Costa testified that the subcontractors would show up for brief periods, but complained to him that Merryman was not paying them or providing them the wood and supplies they needed to move forward. When Merryman quit the job in September, the only work that had been done was putting up scaffolding and tearing off the burnt portion of the roof, plus some framing. When Costa inquired about covering the open roof, Merryman told him it was not necessary because the interior drywall would expand and contract; it later rained inside the house, causing more damage. Costa eventually paid the subcontractors some extra cash to cover up the open portion of the roof. Merryman also failed to remove the debris as required by the contract. The work that Merryman did perform was not of good workmanlike quality, and the framing that was done was crooked, failed code inspection, and had to be redone by a new contractor hired by Costa. Photos of the Costa home in the condition that Merryman left it were admitted into evidence.

Costa and his wife paid Merryman a total of about $12,000 toward the contract price of $15,915, but Costa testified that Merryman's subcontractors did only about $2,000 or $3,000 worth of work; Merryman was hardly ever there. Costa testified that Merryman lied to him and stole their money. Once the contract was signed, Merryman disappeared and could not be reached. In September 2008, Merryman wrote up a change order for an additional $3,800 of work he claimed Costa had instructed his workers to do that was outside the contract; Costa did not sign it or pay it because it was not true. Merryman threatened to put a lien on the Costa home even though they had made the contract payments to date. Merryman's bank records

showed that four days before he told Costa he owed him an additional $3,800, his account was overdrawn. Costa also found out that the license number Merryman showed him from the Texas Residential Construction Commission was not a real license number. Finally, Costa testified he and his wife had to pay rent to live elsewhere while their house was being repaired, and it cost an extra $5,000 or $6,000 to get the repairs finished by someone else.

Finally, Stephen Dodwell testified he hired Merryman to put in a door and bathroom on the lower level of his home to provide access to the pool. Dodwell stated he was unsatisfied because Merryman dragged out the job for four months instead of the projected six weeks, did not finish the job, and provided less than professional quality workmanship. Dodwell had to hire others to help him finish the work at an additional cost of about $3,000. Dodwell paid Merryman a total of $20,000 on the contract price of $24,000, including an extra $1,000 to entice Merryman to come back out and put in the contracted-for shower. Dodwell estimated Merryman completed 75 to 80% of the project, and thought Merryman had performed about $20,000 worth of work.

At the conclusion of the guilt/innocence phase, the jury found Merryman guilty on each of the six counts.[3] After considering the punishment evidence, the jury recommended Merryman be sentenced to 16 years of imprisonment on Counts I and II (second degree felonies), 10 years of imprisonment on Count III (third degree felony), and two years on Counts IV, V, and VI (state jail felonies). The jury did not recommend a fine. The jury denied Merryman's application for community supervision on the counts on which it recommended sentences of 10 years or less. The trial court imposed sentence on each count in accordance with the jury's recommendations,

---

[3] Merryman did not return from a lunch break toward the end of the State's case-in-chief, and was not present for the remainder of the trial. The trial court denied defense counsel's motions for a mistrial and continuance, finding that Merryman had voluntarily and deliberately absented himself from the proceedings. *See* TEX. CODE CRIM. PROC. ANN. art. 33.03 (West 2006).

ordering that the sentences be served concurrently. The court also imposed $68,000 in total restitution on the misapplication counts, as follows: Count I: $40,000, Count III: $20,000, and Count V: $8,000. Merryman now appeals.

LEGAL SUFFICIENCY OF THE EVIDENCE

In several issues, Merryman challenges the legal sufficiency of the evidence to support his convictions for misapplication of fiduciary property in Counts I, III, and V, and his convictions for theft by deception in Counts II, IV, and VI.

### *Standard of Review*

In reviewing the legal sufficiency of the evidence, we determine whether, viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). The standard applies equally to both direct and circumstantial evidence. *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000). In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony. *Brooks*, 323 S.W.3d at 899. The jury may make reasonable inferences from the evidence presented. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (jury may draw reasonable inferences from the basic facts to the ultimate facts).

### *Misapplication of Property Held as a Fiduciary*

Merryman makes the same argument with respect to each of the three misapplication convictions—that there is no evidence he held the customers' property, i.e., money, as a fiduciary. The State responds that the evidence showing Merryman accepted the customers' payments for the agreed purpose of completing construction projects, but applied the payments

to his personal expenses while neglecting to pay job-related expenses and to perform the jobs, is sufficient to prove that he misapplied the customers' property that he held in trust as a fiduciary.

A person commits the offense of misapplication of fiduciary property by intentionally, knowingly, or recklessly misapplying property he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property. TEX. PENAL CODE ANN. § 32.45(b) (West 2011). Subsection (a) of section 32.45 defines a "fiduciary," in relevant part, as any person acting in a fiduciary capacity. *Id.* § 32.45(a)(1)(C) (West 2011). The phrase "acting in a fiduciary capacity" is not defined in the code; the Court of Criminal Appeals has construed the undefined phrase according to its plain meaning and normal usage to apply to anyone acting in a fiduciary capacity of trust. *Coplin v. State*, 585 S.W.2d 734, 735 (Tex. Crim. App. [Panel Op.] 1979) (with the exception of a commercial bailee as provided in the statute); TEX. GOV'T CODE ANN. § 311.011(a) (West 2005). Based on the plain and ordinary meaning of the word "fiduciary" as "holding, held, or founded in trust or confidence," we have held that a person acts in a fiduciary capacity within the context of section 32.45 "when the business which he transacts, or the money or property which he handles, is not his or for his own benefit, but for the benefit of another person as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part." *Gonzalez v. State*, 954 S.W.2d 98, 103 (Tex. App.—San Antonio 1997, no pet.) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 845 (1981), and BLACK'S LAW DICTIONARY 625 (6th ed. 1990)); *see also Talamantez v. State*, 790 S.W.2d 33, 35 (Tex. App.—San Antonio 1990, pet. ref'd).

In order for the customers' property to be held in a fiduciary capacity, there must have been an agreement between Merryman and the customers that the property was entrusted for a particular purpose. TEX. PENAL CODE ANN. § 32.45(a)(2)(A) (West 2011) (to "misapply"

- 11 -

property is to "deal with property contrary to an agreement under which the fiduciary holds the property"); *Skillern v. State*, 355 S.W.3d 262, 268 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (to establish misapplication of fiduciary property, state must prove an agreement between defendant and complainant regarding how the funds are to be spent, and that defendant's actions violated that agreement). An "agreement" is "a harmonious understanding or an arrangement as between two or more parties, as to a course of action." *Gonzalez*, 954 S.W.2d at 104. The agreement under which a fiduciary holds property or money need not be a written contract, but may be only an understanding or arrangement as to a particular course of action. *Id.* (citing *Bynum v. State*, 767 S.W.2d 769, 774-75 (Tex. Crim. App. 1989)). The State is only required to prove that the fiduciary failed to apply the funds according to the terms of the agreement; the actual manner in which the fiduciary applied the funds is immaterial. *Skillern*, 355 S.W.3d at 268-69; *Little v. State*, 699 S.W.2d 316, 318 (Tex. App.—San Antonio 1985, no pet.).

Here, the written contracts were evidence of an agreement between Merryman and each customer as to a particular course of action, i.e., the construction projects. The customers testified they entrusted their funds to Merryman under an agreement that he would complete their construction projects. Further, the evidence showed that Merryman had full knowledge of the agreements under which he accepted the customers' payments. *See Skillern*, 355 S.W.3d at 269 (evidence must show defendant had knowledge of the agreement under which he held property in trust).

Merryman argues there is no evidence he was acting in a fiduciary capacity because the construction contracts were for the mutual benefit of both parties and carried joint obligations— for the customer to make the specified payments as scheduled and for him to complete the construction project according to the specifications of the contract. He asserts he did not

complete any of the projects because the customers breached when they stopped paying him. Merryman further argues the contracts did not specify how the customers' payments were to be applied, i.e., what portions were allocated for his profit or for labor, or that the funds could not be intermingled with funds from other projects or with his personal funds; therefore, he contends there is no evidence that he held the funds in trust for the customers' benefit. The terms of the contracts do not, however, control the analysis of whether there was a fiduciary responsibility owed by Merryman. The key fact is that there was an overall agreement or understanding between the parties, beyond the terms of the contracts, that the customers' funds were entrusted to Merryman for a construction project; Merryman thus had an obligation not to subject those funds to a substantial risk of loss. *See* TEX. PENAL CODE ANN. § 32.45(a)(2)(A), (b). Merryman's actions violated the agreement and prevented the customers from realizing the full benefit of the funds they entrusted to Merryman, resulting in a loss to the customers of the value of their funds. *See Skillern*, 355 S.W.3d at 268-69.

Viewing the evidence in the light most favorable to the jury's verdict, there is legally sufficient evidence that Merryman acted in a fiduciary capacity within the meaning of section 32.45 with respect to each misapplication count. Accordingly, Merryman's challenge to his misapplication convictions is overruled.

### *Theft by Deception*

With respect to each of his theft convictions (Counts II, IV, and VI), Merryman argues there is no evidence that he intended to appropriate the customers' payments through deception; he asserts there is no evidence showing he did not intend to perform on the contracts at the time they were signed because he did partially perform on each project. The State responds that the evidence shows Merryman operated a scam, never intending to fully perform the construction

projects when he accepted the payments, and simply demanding payments for as long as he could while doing minimal work before quitting the job and keeping the money. It also asserts the evidence that Merryman spent the customers' payments on his personal expenses, while failing to pay project expenses and to finish the jobs, shows his intent to unlawfully deprive the customers of their money. Finally, the State argues the continuing pattern of Merryman's actions during 2008 and 2009 constitutes evidence of his intent to deceive the customers and unlawfully appropriate their payments.

A person commits the offense of theft if he "unlawfully appropriates property with intent to deprive the owner of property;" appropriation is unlawful when it is without the owner's effective consent. TEX. PENAL CODE ANN. § 31.03(a), (b)(1) (West Supp. 2012); *McClain v. State*, 687 S.W.2d 350, 353 n.7 (Tex. Crim. App. 1985) (to "appropriate" means any exercise of control over the property in question). Consent is not effective when it is induced by deception. TEX. PENAL CODE ANN. § 31.01(3)(A) (West Supp. 2012); *Ehrhardt v. State*, 334 S.W.3d 849, 853 (Tex. App.—Texarkana 2011, pet. ref'd) (to "induce" means "to bring about, produce, or cause"). One means of deception under the theft statute is "promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed." TEX. PENAL CODE ANN. § 31.01(1)(E) (West Supp. 2012).

In support of his argument, Merryman points to the evidence that he started each project, and contends he only quit the job after a "payment dispute" arose in each instance. He suggests his failure to complete the jobs was merely due to contractual disputes, and therefore his retention of the payments was not an unlawful appropriation of the customers' money through deception. Merryman relies on authority holding that the mere failure to perform a contract, or "to return or pay back money after failing to perform a contract," is insufficient to establish the

offense of theft. *See* TEX. PENAL CODE ANN. § 31.01(1)(E) (providing that the mere failure to perform, without other evidence of the actor's intent or knowledge, is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed at the time the property was taken); *see also Ehrhardt*, 334 S.W.3d at 853.

Theft in connection with a contract requires more than proof of intent to deprive the owner of the property and subsequent appropriation of the property; it requires proof that appropriation of the property was a result of false pretext or fraud, not merely that the defendant failed to return the property after failing to perform. *Wirth v. State*, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012); *Phillips v. State*, 640 S.W.2d 293, 294 (Tex. Crim. App. [Panel Op.] 1982) (absent any evidence of deception by false impression of law or fact, contractor who failed to perform contract to build home addition was not guilty of theft, but merely a failure to perform the contract). The evidence must also show that the defendant intended to deprive the owner of the property at the time it was taken. *Wirth*, 361 S.W.3d at 697. In reviewing sufficiency of the evidence of this type of theft, the appellate court considers the events before, during, and after commission of the offense, as well as the defendant's actions which show an understanding and common design to commit the offense. *Id.*; *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

Here, there is evidence in the record that supports a finding that Merryman did more than simply fail to perform the contracts and fail to refund the money. The evidence shows a series of transactions between Merryman and customers with the same pattern—promising to complete the construction projects in a short time-frame (one to two months), demanding advance payments on a tight weekly schedule regardless of job progress, beginning a minimal amount of work and then stopping and walking off the job, leaving it unfinished after a "payment dispute"

arose, and giving no refund of payments made. In addition, each complainant testified that during the period before they signed the contract, Merryman was always available and responsive, but once the contract was signed, he hardly came out to the site and failed to return their phone calls and emails. He frequently demanded payments, some in excess of the contract amount pursuant to change orders the customers testified they did not request, and often threatened to file a lien and walk off the job when customers balked at making a payment based on the minimal progress. Merryman's bank records show he immediately deposited the checks into a business account which was often overdrawn, and used the bulk of the customers' money for personal living expenses instead of project-related expenses. The jury could have reasonably construed Merryman's actions before, during, and after the contracts were signed as showing that he used a false pretext to obtain the customers' money, and thus induced them into the contracts through deception.

There is sufficient evidence to support a finding that Merryman promised to perform the construction contracts in order to induce the customers' payments when he did not intend to perform or knew he would not be able to perform the contracts. *See* TEX. PENAL CODE ANN. § 31.01(1)(E); *see Wirth*, 361 S.W.3d at 697. Because there is legally sufficient evidence that Merryman induced the complainants into entering the contracts by deception, and thus unlawfully appropriated their payments in violation of section 31.01, we overrule Merryman's challenge to his theft convictions.

### PUNISHMENT PHASE

Merryman raises two issues concerning punishment: (1) that the trial court's response to the jury's questions during punishment deliberations was harmful error because it reduced the likelihood he would receive community supervision from the jury; and (2) that the 16-year

sentences imposed on Counts I and II, increased to second degree felonies based on an elderly victim, are illegal because there was no evidence and no specific finding of an elderly victim.

## *Trial Court's Response to Jury Questions*

Merryman argues he was harmed by two of the trial court's responses to the jury's questions during their punishment deliberations. The record shows the jury sent the following questions to the trial court during its punishment deliberations:

> Is sentence time served consecutive or overlap?
> Which time served comes first? jail time or prison time?
> Does jail time count towards prison time and vise [sic] versa?
> If fine is given, will funds go to victims?
> **Can Merryman file bankruptcy during probation and not pay victims back?**
> **If granted probation, will paying back funds to victims be mandatory?**
> **If so, what happens if funds are not paid back?**
> (emphasis added)

The trial court called the attorneys into court and read them its proposed response to the jury as follows:

> Ladies and Gentlemen of the Jury:
>
> In response to your several questions I tell you as follows:
>
> (1) I cannot say how the terms will be served, except to say all sentences are presumed to be served concurrently, unless specifically stated to be served consecutively. There are procedural rules involved in consecutive sentencing. So, you must simply assess a sentence on each count without consideration as to how the sentence should be served.
>
> (2) A fine goes to the State and County, not the Victim.
>
> **(3) Bankruptcy is a federal procedure and I cannot comment on how bankruptcy may impact a probationer's responsibility to pay restitution.**
>
> **(4) Making restitution to the victim is usually imposed as a condition of probation, but is not mandatory. If a condition of probation is not completed, the State may, but does not have to, file a motion to revoke the probation.**
> (emphasis added)

The State agreed that "those are the legal answers to the questions." Merryman's counsel stated, "we object to those responses and just ask that the jury be instructed that they have all the law they need to decide on punishment." The court implicitly overruled Merryman's objection by giving the jury the responses stated above.[4]

On appeal, Merryman argues the court's answers #3 and #4 constituted substantive responses, and thus supplemental jury instructions, which were misstatements of the law. *See* TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007) (requiring the trial judge to deliver a jury charge that distinctly sets forth the law applicable to the case); *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993) (substantive response to jury question during deliberations amounts to a supplemental jury instruction). Merryman argues that such erroneous instructions harmed him because they reduced his chance of receiving community supervision from the jury. The State responds that any error was not preserved by a proper objection, and that Merryman cannot show he suffered any harm, much less egregious harm, because he failed to establish he was eligible for community supervision.[5]

In analyzing a complaint of jury charge error, the appellate court first determines whether error exists, and then evaluates that error for harm. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (preservation of error does not become an issue until the harm analysis). If error is found in the jury charge, the degree of harm necessary for reversal depends on whether the error was preserved by objection; if preserved, a showing of only "some harm" is required,

---

[4] The State suggests it is not clear from the record that the court's proposed responses were actually given to the jury. However, as noted by Merryman, when presented with a silent record, we presume the trial court complied with the requirements of article 36.27 in communicating with the jury. *Word v. State*, 206 S.W.3d 646, 651 (Tex. Crim. App. 2006); TEX. CODE CRIM. PROC. ANN. art. 36.27 (West 2006).

[5] The terms "community supervision" and "probation" are used interchangeably.

but if not preserved, a showing of "egregious harm" is necessary. *Id.* at 743-44; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

With respect to whether the court's responses #3 and #4 were error, the trial court is authorized to give instructions only on the law applicable to the case, not on factual matters. TEX. CODE CRIM. PROC. ANN. art. 36.14; *Daniell*, 848 S.W.2d at 147. When the trial court gives a substantive response to a jury question during deliberations, that response constitutes a supplemental jury instruction. *Daniell*, 848 S.W.2d at 147. However, a response that merely refers the jury to the original charge, or informs the jury that the court is unable to answer their question, does not constitute an additional jury instruction. *Id.* Here, with respect to question #3 concerning the effect of bankruptcy on restitution, the court expressly stated it "could not comment" on what effect a federal bankruptcy may have on a state probationer's responsibility to pay restitution. The court made no substantive statement of the law on that issue (except to correctly state that bankruptcy is a federal procedure). This was, in effect, the same as the response requested by defense counsel—that the jury be referred back to the punishment charge and told they had all the law they needed to decide punishment. Thus, the court's response did not constitute a supplemental jury instruction, and was not error. *See id.* With respect to question #4 concerning restitution as a condition of probation, the court did give a substantive response, but it was a correct statement of the law. The court instructed the jury that restitution to the victim may be, and "usually is," imposed as a condition of probation, although it is not a mandatory condition. *See* TEX. CODE CRIM. PROC. ANN. art. 42.037(a) (West Supp. 2012). The court also correctly stated that if a condition of probation is not completed, the State may, in its discretion, choose to file a motion to revoke the probation. *See* TEX. CODE CRIM. PROC. ANN.

arts. 42.037(h), 42.12 §§ 21, 23 (West Supp. 2012).  Therefore, the court's responses to the jury's questions #3 and #4 were not error.  Accordingly, this issue is overruled.

### *Sentences – Counts I and II (Richard Clifton)*

Finally, Merryman argues that the evidence is legally insufficient to support the 16-year sentences imposed for Count I (misapplication) and Count II (theft) because (i) the jury did not make a specific finding that Richard Clifton was an "elderly individual" under the penal code sections used to increase the grade of offense, and (ii) the evidence showed that Richard Clifton was acting in his capacity as an officer of Hair Art LLC when he signed the contract and made the payments, and a corporation cannot be an "elderly individual."  The State responds that Richard Clifton was the complainant identified in both the indictment and the jury charge, and the evidence showed he was over 65 years old and was the sole owner, along with his wife, of the corporation and the funds used to make the payments.

Count I of the indictment charged Merryman with misapplication of fiduciary property under Penal Code section 32.45, and further alleged that the owner of the property was Richard Clifton, "who was then and there an elderly individual, and the person for whose benefit the property was held."  The effect of this additional allegation concerning an elderly victim was to increase the offense to the next higher category of offense.  TEX. PENAL CODE ANN. § 32.45(d) (West 2011).  Subsection (c) of section 32.45 provides the offense is a third degree felony if the value of the property misapplied is $20,000 or more but less than $100,000, which was the value alleged in Count I of the indictment; thus, the elderly victim allegation increased the offense to a second degree felony.  *Id.* § 32.45(c).  An "elderly individual" for purposes of section 32.45 is defined as "a person 65 years of age or older."  *Id.* § 32.45(d), 22.04(c)(2) (West Supp. 2012).

Similarly, Count II of the indictment charged Merryman with theft of property valued at $20,000 or more but less than $100,000 which was owned by Richard Clifton, "who was then and there an elderly individual." The allegation of an elderly victim had the same effect as in Count I, increasing the grade of offense to the next higher category. TEX. PENAL CODE ANN. § 31.03(f)(3)(A) (West Supp. 2012). A theft offense is a third degree felony if the value of the property stolen is $20,000 or more but less than $100,000, so the elderly victim allegation increased the offense to a second degree felony. *Id.* § 31.03(e)(5), (f) (West Supp. 2012).

Rather than receiving a sentence within the 2 to 10 year punishment range applicable to a third degree felony, Merryman was sentenced to 16 years of imprisonment on both Counts I and II, which is within the 2 to 20 year range for a second degree felony. *See* TEX. PENAL CODE ANN. §§12.33, 12.34 (West 2011). Merryman contends the higher sentences are "illegal" because they are not supported by a specific jury finding or sufficient evidence that the owner of the property was an "elderly individual."

### *Jury Finding*

Merryman contends that because the jury did not make a specific finding that the owner of the misapplied and stolen property was an "elderly individual," it was not authorized to assess punishment within the range of a second degree, rather than a third degree, felony. However, Merryman's counsel did not request a specific finding that the complainant was an "elderly individual," and did not object to its omission from the guilt/innocence charge. During the charge conference, defense counsel did question whether an elderly victim was "an additional element," stating, "I thought maybe elderly would be maybe found as an additional element in the counts involving Mr. Clifton." But, after further discussion, counsel indicated his agreement with the charge, stating, "I don't have any additional - - I don't have any objections." After other

revisions were made to the charge, defense counsel again stated on the record that he had no objections to the charge.

Merryman cites no authority in support of his argument that a special finding on "elderly individual" is required. Indeed, a specific jury finding on the allegation of an elderly victim is not necessary as long as the jury found all the elements of the offense as alleged in the indictment, which they did. A general verdict finding the defendant guilty of the offense "as charged in the indictment" constitutes an affirmative finding on each element of the offense alleged in the indictment. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 1(a) (West Supp. 2012) (providing for a general verdict in every criminal action); *see Bautista v. State*, 363 S.W.3d 259, 267 (Tex. App.—San Antonio 2012, no pet.) (jury finding of guilty "as charged in the indictment" included a deadly weapon finding).

### *"Elderly Individual"*

Counts I and II alleged that Richard Clifton was the owner of the subject property, i.e., the money paid to Merryman. On appeal, Merryman asserts that all the evidence showed that Richard Clifton was acting in his capacity as Vice President and Treasurer of Hair Art, LLC at all times, and thus the corporation, not Clifton, was the "owner" of the misapplied and stolen property. Since the corporation was the true victim of the offenses, Merryman contends there was no evidence to support the increased offense level applied for an "elderly individual" victim in Counts I and II; thus, his 16-year sentences must be vacated.

The Penal Code broadly defines an "owner" of property as anyone having a possessory interest in property through title or possession, or a greater right to possession of the property than the defendant. *See* TEX. PENAL CODE ANN. § 1.07(a)(35)(A), (a)(39) (West Supp. 2012); *Garza v. State*, 344 S.W.3d 409, 413 (Tex. Crim. App. 2011) (recognizing that the legislature has

given "owner" an expansive meaning).  With respect to misapplication of fiduciary property, the State needed to prove that Richard Clifton was either the "owner" of the property or "the person for whose benefit the property was held," while the theft offense required the State to prove that Richard Clifton was the "owner" of the stolen property.  *See* TEX. PENAL CODE ANN. §§ 31.03(a), 32.45(b).

Here, both Counts I and II alleged that Richard Clifton was an "elderly individual," and that Clifton was the owner of the misapplied property or the person for whose benefit the property was held (Count I), and that Clifton was the owner of the stolen property (Count II). The jury charge used the same language as the indictment.  In both counts, the property that was misapplied or stolen was money, specifically the money paid to Merryman for the construction project.  The trial evidence showed that Hair Art, LLC was the contracting entity.  Richard Clifton testified that he and Wendy formed Hair Art, LLC on January 30, 2008; Richard is the Vice President and Treasurer of Hair Art, LLC, and Wendy is the President.  The contract with Merryman was signed on February 1, 2008, between Merryman's business "Care Construction Service" and their business "Hair Art, LLC – Cut n Style;" the salon name is "Cut n Style."  In the space on the contract designated "signature of owner," Wendy's signature appears with the notation "Hair Art, LLC President;" similarly, the second page of the contract contains a signature line for the owner which contains Wendy's signature as President plus Richard Clifton's signature with the notation "VP/Treasurer."  In addition, Richard Clifton's signature with the notation "Treasurer" appears on two change orders related to the contract.  All of the checks to Merryman were written on the Hair Art, LLC account and signed by Richard Clifton as "Senior Vice President and Treasurer of Hair Art, LLC," except the first check which was written by Wendy Clifton on her personal account.  Richard Clifton testified that even though the

LLC was on the contract, and the checks were written on the LLC account, "it was our money" that they paid to Merryman. Richard also testified that he was over 65 years old when the contract was signed with Merryman.

The evidence established an undisputed ownership relationship between Richard Clifton and Hair Art, LLC, showing that Richard was an owner and officer of the LLC and that the money used to pay for the hair salon project belonged to Richard and Wendy Clifton. The evidence showed that Richard, along with his wife, was the "person for whose benefit" Hair Art, LLC acted when it entered into the contract with Merryman and made the payments. Further, the evidence showed that Richard Clifton was an "owner" of the approximately $48,000 paid to Merryman in that he had a greater right to possession of the money, i.e., actual care, custody, control or management of the money, than Merryman.

We conclude the evidence is legally sufficient to prove that the money misapplied and stolen under Counts I and II was owned by Richard Clifton, an "elderly individual" within the meaning of the Penal Code. Accordingly, Merryman's challenge to the 16-year sentences assessed on Counts I and II fails.

## CONCLUSION

Based on the foregoing reasons, we overrule all of Merryman's issues on appeal. The trial court's judgment for Count III is MODIFIED to delete the mistaken notation of an elderly victim and to correct the degree of offense to a third degree felony, and all six judgments of the trial court are AFFIRMED.

Phylis J. Speedlin, Justice

PUBLISH