**AFFIRM; and Opinion Filed August 1, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-16-00558-CR
No. 05-16-00559-CR
No. 05-16-00604-CR
No. 05-16-00605-CR
No. 05-16-00606-CR

**JOHN WARD HUNT, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F15-00097-U, F15-00113-U,**
**F10-01239-U, F10-01240-U, and F10-01241-U**

## MEMORANDUM OPINION

Before Justices Bridges, Lang-Miers, and Evans
Opinion by Justice Lang-Miers

The State indicted appellant John Ward Hunt on five cases of misapplication of fiduciary

property. Three of the cases were first degree felonies and two were state jail felonies. All arose

out of his investment relationship with complainants Barbara Anderl Ahee, Sandra Burns, the

Sandra Kaye Burns Family Trust, and Danna Campbell. The jury convicted appellant of all

charges and assessed his punishment in each of the two state jail felonies at one year

imprisonment and in each of the three first degree felonies at ten years' imprisonment. The jury

recommended suspension of the ten-year sentences. The court imposed sentences according to

the jury's verdict and recommendation and placed appellant on community supervision for eight

years in the first degree felonies. The court also ordered restitution in the amount of $1,786,227.13.

Appellant raises seven issues on appeal. In four issues, he challenges the sufficiency of the evidence with regard to two of the first degree felony convictions and argues the state jail felony convictions must be reversed because they violate the Double Jeopardy Clause.[1] In three additional issues with regard to the state jail felony convictions only, appellant contends his counsel was ineffective at the punishment phase of trial, the trial court violated his common law right of allocution, and the sentences are grossly disproportionate to the crimes. We affirm the trial court's judgments.

## BACKGROUND

Appellant was an investor who traded exclusively in high-risk stock options through his firm, Hunt Advisors LLC. Sometime in the mid- to late 2000s, appellant invested funds belonging to Sandy Devine that proved very successful, so much so that Devine was able to sell her business and retire. As a result of her success with appellant, Devine recommended appellant's services to her friends, the complainants in these cases.

Each complainant met with appellant to discuss his services and decided to allow him to manage and invest their funds. Ahee opened two accounts, an individual account and a rollover IRA account; Burns opened an individual account but then transferred almost all of the assets into a trust account for her benefit and, upon her death, her disabled son's benefit, and appointed appellant as trustee; and Campbell opened an individual account and a rollover IRA account.

Campbell and Ahee signed an investment management agreement with Hunt Advisors in which they gave appellant authority to invest their respective funds and agreed to pay 2% of the

---

[1] Although appellant filed a notice of appeal in Cause No. F10-01239-U, our Case No. 05-16-00604-CR, involving the Sandra Kaye Burns Family Trust, he does not raise any issues on appeal with respect to that conviction.

value of the assets under management for investment advisory services and 15% of profits earned payable monthly in arrears. Burns's agreement stated that her management fees and percentage of profits were payable quarterly in arrears.

The Texas State Securities Board received a tip that something might be "going on" with appellant and his investment firm. After a review of documents related to the firm, Linda Bailey, the assistant director of the Securities Board, concluded that appellant was operating a hedge fund called the Hunt Fund. Bailey conducted an examination of appellant's business and during the interview with appellant, realized that appellant had lost over 50% of his clients' investments in the Hunt Fund. She asked why, and appellant said "[h]e was trading options."

Upon further review of appellant's records, Bailey realized that appellant's firm held individual investor accounts in addition to the Hunt Fund accounts.[2] And she saw where he "was taking all of the fees directly from the clients on day one. I mean, he had not made an investment, but he was charging them fees." She said the investment agreements did not give appellant authority to charge his clients on day one. As a result of this investigation, the Securities Board revoked the firm's investment adviser registration and appellant's investment adviser representative registration.

Letha Sparks of the Enforcement Division of the Securities Board conducted a forensic examination of appellant's records. She testified about the amount of loss suffered by the complainants in their individual accounts as a result of appellant's investments. She compared appellant's records to the agreements he had with the complainants and determined that appellant took fees that had not been earned. Sparks testified that appellant took unauthorized payments in the form of performance fees from Ahee and Burns in the following amounts: $19,235.53 from Ahee's accounts, and $60,449.72 from Burns's accounts.

---

[2] The complainants' individual accounts, not their Hunt Fund accounts, are the subject of these indictments.

**Additional facts regarding Campbell.** Campbell, who had a masters degree in business, was a certified public accountant, and worked for a consulting firm performing evaluations and assessments on hospitals to determine how they could be more profitable, testified that in the two years before she transferred her individual and IRA accounts to appellant the accounts had lost approximately 40% of their values due to market fluctuations. She said she was looking for a new money manager at the time she invested with appellant because her manager was leaving the business due to a family illness.

Campbell met with appellant several times before she decided to allow him to manage her money. She told him she was recently divorced and had $100,000 from the divorce settlement, half of which she wanted to save and the other half she wanted to invest, was involved in a custody battle, and was working full time. She also told him she had an IRA, which at that time had a value of $350,000. Campbell told appellant she wanted "a balanced portfolio, which is some conservative funds, some higher risk funds" and "specifically [told him] we were not going to touch the IRA, it was going to be rolled over." Campbell testified that she discussed stock options with appellant, but she "explained to him that [she] wanted a balanced portfolio" and he did not tell her "he was dealing exclusively in options."

When Campbell had not received any statements on her accounts, she called appellant. In mid-March 2009 appellant told her "the investments [in her individual account] had not gone as well as hoped and that it had been necessary to 'dip' into the IRA-related account to cover losses from [her] other account." Campbell said she was "furious" and reminded him that she "specifically told [him] not to touch my IRA money." She said she would be taxed and penalized on the withdrawal and that he should put the money back. On cross-examination, Campbell testified that she told appellant to stop trading in her IRA account and to "[t]ry to build that back up."

In mid-April, Campbell sent appellant an email asking him to estimate how much she would make in her IRA account for that month. Appellant responded that she "took another loss for April in your IRA." Campbell replied that she "can't take any more losses in my IRA. I would appreciate u being more conservative in your trades so you can build it back up to what I started with three years ago . . . and then just let it grow much more slowly." On cross-examination, she said she sent him the email because she "wanted to know if he had put anything else back in there." She said she still did not know what trades appellant was making because she had yet to receive a statement. She said she received a statement in June which showed that appellant had lost $235,730 from both accounts.

In July, Campbell learned that her accounts were nearly depleted. In August, she demanded the return of her funds. Sparks testified that her examination showed Campbell's final account balance was $17,832.03.

**Additional facts regarding Ahee**.[3] Ahee testified that she met appellant in September 2001 through appellant's wife, who was a student at Ahee's yoga studio. They stayed in touch for about two or three years and at that time, appellant's business was not investments. Ahee lost contact with appellant and his wife because Ahee and her husband were involved in a custody battle with her husband's ex-wife. Ahee and appellant reconnected around 2008 after Devine told Ahee how she was very pleased with what he had done for her.

Ahee said she and her husband "had gone through a lengthy custody battle" with his ex-wife and did not have "any cash flow money left." She described their financial situation at the time and how they were heavily in debt. They wanted to "figure out a way to use what savings we had left, to see if it might be able to turn into a retirement at some point." They were hoping

---

[3] Ahee is Barbara Anderl's married name. Most of the documents list her last name as "Anderl," but she identified herself at trial using the last name "Ahee." In addition, the record contains some documents that spell her first name "Barbera." It is undisputed that these records relate to the complainant in this case.

appellant "could manage our money in the same way" he managed Devine's, "[k]ind of like a ten-year plan." Ahee had a 401(k) that she started when she got out of college and had been putting money into it each month for twenty years. It was valued at just under $450,000 at that time.

Ahee described appellant's relationship to her and her husband as "like a father figure" and "very close in the beginning" before they lost touch due to the custody battle. When they reconnected in 2008, appellant told them he could "bring you opportunities and deals that nobody else in town can because I'm a Hunt. And because I'm a Hunt I have relationships and contacts and communications with deals that somebody of – in your situation would never be presented with." She said they did not have "a lot of earning years left with which to build a retirement" and told appellant they wanted "a balanced portfolio so not everything was in high risk, but not everything was in, you know, low growth either."

Appellant discussed investments with Ahee and her husband. Appellant said he wanted to be the Ahees' advisor and help them manage their money. He "wanted to know exactly" what their monthly expenses were so he could help them. He also told them he had a man in his office who would help Ahee's husband with the bookkeeping and taxes for his business as "a perk of doing business with" appellant. Ahee left the meetings with the impression that appellant "was wealthy, he was a Hunt, he had plenty of money and he really wanted to help people and he considered us his friends and he wanted to help us so that we would be comfortable as – as we retired and we wouldn't struggle to send our son to college." Ahee decided to invest with appellant, and her initial investment of about $123,000 came from a previous investment with a different advisor. This investment is not the subject of the indictment.

Ahee signed the investment management agreement in which she gave appellant "full authority" as her agent "to manage the assets in [her] account on a fully discretionary basis." But

she said appellant told her that most of "these forms are gobbledygook and they need to be in your file . . . just go ahead and sign everything." He also said "it was low risk and that he would take care of me." Ahee signed two investment management agreements because appellant told her "that the investments were going so well and making so much money that I made the decision to give him even more money." But she did not know if she had a brokerage account in her name because she never got a statement.

Ahee testified that she never touched her 401(k), but she did a direct rollover into an IRA account for appellant to manage. She said he was not supposed to use her 401(k) or her individual account for high-risk investments. She testified that if appellant had told her that he traded exclusively in high-risk stock options, she would not have trusted him with her money. She said appellant might have used the word "options" in their discussions, but he never used the words "high risk." And when appellant asked her on cross-examination to confirm that she invested an additional $57,000 and $439,000 that went into her individual account, she said "[i]t should not have. The 439 is IRA rollover. It should not have been anything but an IRA rollover." Ahee said appellant was supposed to treat her 401(k) "[l]ike his own" and her principal was not supposed to ever be at risk. She said the 401(k) "was suppose[d] to be generally conservative investments."

Ahee said she never received a statement although she "asked dozens of times." She testified that she received "a couple of e-mails" but nothing in them made her believe her money was gone or was in danger of disappearing. In July 2009, she received what she called "a gemmed up Excel spreadsheet" in an email showing that her 401(k), which had a value of around $450,000 when she rolled it over with appellant, was now valued at around $72,000. The spreadsheet showed withdrawals for payments to Hunt Advisors for performance fees and

operating expenses and it showed that appellant took these amounts "off the top" instead of in arrears as per the agreement.

After she received this report, she told appellant in an email "to not touch any more – any more of my money and to return it all immediately." She also called appellant's office, but no one answered the phone after multiple attempts. And when she could not reach appellant, she called Think or Swim, the brokerage firm. It was unable to locate an account in her name and refused to provide information to her. She ultimately determined that her funds were under the name of Vince Trankina, who works for Think or Swim. And all the statements for her investments appeared to be going to Trankina.

In August, Ahee sent a letter to appellant advising him "to close all accounts" in her name and wire transfer the balance to her bank account. Sparks testified that her examination showed Ahee's final account balances totaled $25,393.23.

**Additional facts regarding Burns**. Appellant does not challenge the conviction with regard to the Burns Family Trust. The evidence showed that Burns transferred almost $1.2 million to appellant that was ultimately transferred to the Burns Family Trust for appellant to manage. The final account balance according to Sparks's investigation was $7,611.97.

### SUFFICIENCY OF THE EVIDENCE

In issues one and two, appellant challenges the sufficiency of the evidence to support the first degree felony convictions involving Campbell and Ahee.

### Applicable Law

A person commits the offense of misapplication of fiduciary property if the person (1) intentionally, knowingly, or recklessly (2) misapplies property he holds as a fiduciary, (3) in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held. Act of May 29, 1993, 73d Leg., R.S., ch. 900 § 1.01, sec.

–8–

32.45(b), 1993 Tex. Gen. Laws 3586, 3652 (subsequent amendments omitted) (current version at TEX. PENAL CODE ANN. § 32.45(b) (West 2016).[4] To "misapply" property means to "deal with property contrary to [ ] an agreement under which the fiduciary holds the property[.]" TEX. PENAL CODE ANN. § 32.45(a)(2)(A).

### Standard of Review

We review a challenge to the sufficiency of the evidence under the well-established standards set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Wilson v. State*, 448 S.W.3d 418, 425 (Tex. Crim. App. 2014). We view the evidence in the light most favorable to the verdict and determine whether a rational jury could have found all the elements of the offense beyond a reasonable doubt. *Id.* "We will uphold the verdict unless a rational factfinder must have had reasonable doubt with respect to any essential element of the offense." *Id.* In our review, we are mindful that the jury is the sole judge of the credibility and weight of the evidence. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

### Discussion

The only element of the offense that is in dispute on appeal, or that was in dispute at trial, was whether appellant acted contrary to his agreements with Campbell and Ahee. He contends that Campbell and Ahee gave him full discretionary authority to conduct trades in their accounts, and they signed forms stating their number one investment goal was increase in income through speculative, high-risk investments. Consequently, he argues, no reasonable jury could have convicted him of misapplication of their fiduciary property.

---

[4] At the time these offenses were committed, the misapplication of property with a value of $200,000 or more constituted a first degree felony, and the misapplication of property with a value of $1500 or more but less than $20,000 constituted a state jail felony. The property values for a first degree felony and a state jail felony are different under the current version of the statute. *See* TEX. PENAL CODE ANN. § 32.45(c)(4), (7) (West 2016). However, because the substantive elements of the offense are the same, future references will be to the current version of the statute.

The statute defines "misapply" as to "deal with property contrary to . . . an agreement under which the fiduciary holds the property." TEX. PENAL CODE ANN. § 32.45(a)(2)(A). "Agreement" is not defined in the statute, so we give the word its common and ordinary meaning. TEX. GOV'T CODE ANN. § 311.011(a) (West 2013) (words and phrases in statute should be read in context and construed according to rules of grammar and common usage). "[A]n agreement is a harmonious understanding or an arrangement, as between two or more parties, as to a course of action." *Bynum v. State*, 767 S.W.2d 769, 777 (Tex. Crim. App. 1989). It can be written or oral. *See id*.

Appellant argues that the investment management agreement that Campbell and Ahee signed is their agreement giving him complete discretionary authority with regard to investing their funds. He notes the language in the agreement stating, "You hereby grant to HUNT full authority as your agent and attorney-in-fact to manage the assets in your account on a fully discretionary basis." But appellant ignores other language in the agreement stating that he would make "investments that are suitable for your account based off your investment objectives and instructions." The "complete discretionary authority" appellant claimed to have been given in the investment management agreement was limited by that same agreement to those investments that were suitable for Campbell's and Ahee's respective goals and objectives.

Appellant contends that Campbell's and Ahee's goals and objectives were to invest their funds in the same manner as he did with Devine's funds, in high-risk investments. He points to new account approval forms to support this argument. These forms stated with regard to both Campbell and Ahee that their number one investment objective was "Speculative (want increase in value of investments – High Risk)." But the forms were not signed by either complainant, and both testified that the first time they saw these forms was in preparation for trial. Consequently,

–10–

these forms do not support appellant's arguments regarding the complainants' goals and objectives for their investments.

The evidence showed that both Campbell and Ahee discussed their respective IRA rollovers with appellant and told him that their goals and objectives for those accounts were to allow them to grow slowly with conservative investments. Both testified that if they had known appellant traded exclusively in high-risk investments, they would not have allowed him to manage their funds. The investment management agreement did not contain any language authorizing appellant to invest their funds in a manner contrary to these goals and objectives.

Appellant argues that Campbell's email, in which she asked the value of her IRA, shows she was aware he was using her IRA to make stock trades and "left no doubt that . . . she had desired [him] to keep conducting trades using the IRA." He claims the email did not tell him to stop trading in the IRA but "to trade more conservatively." He argues that he "could well have interpreted [the email] as authorizing him to continue trading in options, albeit in a more conservative manner." Although the email suggested that Campbell became aware appellant was using her IRA account to make trades, it does not suggest or imply that Campbell and appellant agreed that he was authorized to use the IRA for high-risk investments. And Campbell testified that she specifically told appellant not to touch her IRA, and when she learned he had, she specifically told him to stop.

Appellant also argues that when Ahee told him "she wanted him to do for her what he had done for Devine," he interpreted that as "her wanting him to invest as he had for Devine, which was in the form of options." But while appellant's interpretation may be reasonable when referring to Ahee's investment in the Hunt Fund, the undisputed evidence showed that Ahee instructed appellant not to touch her 401(k) rollover.

–11–

The jury is the sole judge of the credibility of the evidence and could have believed Campbell's and Ahee's testimony that they and appellant reached an understanding with regard to their IRA accounts and that understanding was to invest the accounts in a balanced portfolio for long-term safekeeping. Instead, appellant used both IRA accounts to trade in high-risk investments. Consequently, we conclude the evidence is legally sufficient to support the verdict that appellant misapplied Campbell's and Ahee's property. *See Merryman v. State*, 391 S.W.3d 261, 270 (Tex. App.—San Antonio 2012, pet. ref'd); *Romine v. State*, 722 S.W.2d 494, 502 (Tex. App.—Houston [14th Dist.] 1986), *pet. denied*, 747 S.W.2d 382 (Tex. Crim. App. 1988) (per curiam).

We resolve issues one and two against appellant.

### DOUBLE JEOPARDY CLAIMS

In issues three and four, appellant argues that his convictions for the state jail felonies involving complainants Burns and Ahee must be vacated because they violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. The State argues that appellant did not preserve these issues for review because he did not raise them in the trial court, and the violations are not clearly apparent on the face of the record.

### Applicable Law

The Double Jeopardy Clause bars multiple prosecutions for the same offense, multiple convictions for the same offense, and multiple punishments for the same offense. *See Illinois v. Vitale*, 447 U.S. 410, 415 (1980); *Loving v. State*, 401 S.W.3d 642, 646 (Tex. Crim. App. 2013). When an appellant did not raise a double jeopardy claim at the trial court level, as in this case, he must meet two conditions to raise it for the first time on appeal. He must establish that (1) the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record, and (2) enforcement of the usual rules of procedural default serves no legitimate state interest. *Ex*

*parte Denton*, 399 S.W.3d 540, 544 (Tex. Crim. App. 2013). "A double-jeopardy claim is apparent on the face of the trial record if resolution of the claim does not require further proceedings for the purpose of introducing additional evidence in support of the double-jeopardy claim." *Id*.

At issue here is whether appellant was punished multiple times for the same offense. We conclude he was not.

**Discussion**

A double jeopardy multiple punishments claim arises under two scenarios: (1) in the context of lesser included offenses, where the same conduct is punished under both a greater and a lesser included offense, and (2) when the same conduct is punished under two distinct statutes where the legislature intended for the conduct to be punished only once. *Garfias v. State*, 424 S.W.3d 54, 58 (Tex. Crim. App. 2014). Neither of those scenarios is present here.

To establish the offense of misapplication of fiduciary property, the State had to prove the identity of the victim, the property allegedly misapplied, and the fiduciary agreement under which appellant held the property. *Demond v. State*, 452 S.W.3d 435, 460 (Tex. App.—Austin 2014, pet. ref'd). The State did not have to prove how appellant misapplied the property; it had to prove that appellant applied the property contrary to his agreements with the complainants. *Merryman*, 391 S.W.3d at 269–70. Establishing the existence of an agreement was an essential element of the offense. *See id.*; *see also Bynum*, 767 S.W.2d at 775 (agreement determines duty owed by fiduciary). The offense is complete upon the misapplication, and, consequently, the focus of the offense is the misapplication. *See Demond*, 452 S.W.3d at 460; *Merryman*, 391 S.W.3d at 270; *Skillern v. State*, 355 S.W.3d 262, 268–69 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

With regard to the Burns Family Trust, the indictment for the first degree felony alleged that appellant misapplied $200,000 or more of funds belonging to the trust that appellant held as trustee "by accepting the said property under an agreement that [he] would manage and invest said property for long-term safekeeping . . . ."

The indictment for the state jail felony alleged a different property owner, Burns, and charged that appellant misapplied $20,000 or more but less than $100,000 of Burns's money that he held as a fiduciary "by causing the transfer of money for a purpose other than the benefit of Sandra Burns . . . ."

With regard to Ahee, the indictment for the first degree felony alleged that appellant misapplied $200,000 or more that he held as a fiduciary contrary to an agreement that he "would manage and invest said property for long-term safekeeping . . . ." The indictment for the state jail felony alleged that appellant misapplied $1500 or more but less than $20,000 owned by Ahee that he held as a fiduciary "by causing the transfer of money for a purpose other than the benefit of Barbara Anderl Ahee . . . ."

Each of these four indictments alleged different property that was misapplied contrary to two different agreements. The first agreement that appellant had with Burns and Ahee was an oral understanding that he would manage and invest the funds owned by Burns, the Burns Family Trust, and Ahee for long-term safekeeping. Instead, appellant used those funds to invest in high-risk stock options at a substantial risk of loss to the property owners. When appellant invested the owners' funds contrary to his oral agreements, he misapplied those funds.

The second agreement that appellant had with Burns and Ahee was the written investment management agreement that set out the performance fees appellant would be paid for his investment services. When appellant withdrew more fees than these written agreements authorized, he misapplied the property owners' funds.

And with regard to Burns and the Burns Family Trust, the indictments alleged different property owners, which is additional support that the offenses are not the same.

The record showed that appellant misapplied different funds contrary to different agreements and was not punished twice for the same conduct but, instead, was punished once for each offense of misapplication. Consequently, double jeopardy is not apparent on the face of the record and three issues are not preserved for our review.

We resolve issues three and four against appellant.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In issue five, appellant argues that he received ineffective assistance of counsel during the punishment phase of the trial on the two state jail felonies when his counsel failed to object to the jury charge and failed to introduce evidence of his health issues.

### Applicable Law

To prevail on a claim for ineffective assistance of counsel on direct appeal, an appellant must show that his counsel's performance was deficient and that but for counsel's deficient performance there is a reasonable probability the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 700 (1984). A "reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).

A claim for ineffective assistance must be supported by the trial court record, and "'the record must affirmatively demonstrate' the meritorious nature of the claim." *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). Generally, the record is not sufficiently developed on direct appeal because trial "counsel's reasons for failing to do something do not appear in the record." *Id.* at 592–93. And when trial counsel has not been given an opportunity to explain why he did or

failed to do something, a reviewing court should not find his performance deficient unless it "was 'so outrageous that no competent attorney would have engaged in it.'" *Id*. at 593 (quoting *Goodspeed*, 187 S.W.3d at 392).

Our review of trial counsel's performance is highly deferential. *Andrews*, 159 S.W.3d at 102. And we indulge "a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id*. It is appellant's burden to overcome this presumption. *Id*. We evaluate the totality of counsel's representation, and we do not look at counsel's performance in a "piecemeal fashion." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The right to effective assistance does not mean the right to errorless counsel. *Mercado v. State*, 615 S.W.2d 225, 227 (Tex. Crim. App. [Panel Op.] 1981).

### Discussion

The parties concede that the jury charge contained error because persons convicted of state jail felonies do not earn good conduct time but the trial court instructed the jury that good conduct time applied. TEX. CODE CRIM. PROC. ANN. art. 42.12(h)(1) (West Supp. 2016) (stating that defendants confined in state jail facilities instead may be awarded "diligent participation credit"). Appellant's counsel admitted in a hearing on a motion for new trial that he "missed" the error and failed to object to the charge.

Appellant also argues that his counsel was ineffective by failing to develop "affirmative facts regarding [his] various health challenges . . . to provide the jurors who were going to assess [his] punishments with facts regarding the far from optimal level of [his] health."

The ineffective assistance claim was not raised in the motion for new trial. However, appellant argued in the motion that he was entitled to a new punishment hearing because of the error in the jury charge. He also asked the trial court to suspend imposition of the one-year

–16–

sentence in the state jail cases and impose community supervision because of appellant's serious health issues for which he contended he would not receive treatment in jail.

Even if counsel's performance was deficient by failing to object to the jury charge error, appellant has not shown how he was harmed. He argues that "sufficient prejudice" is shown because the trial court based its denial of his motion for new trial on counsel's failure to object to the jury charge. We disagree.

Immediately after the erroneous instruction, the jury charge gave this curative instruction:

> You may consider the existence of good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are further instructed that in determining the punishment in this case, you are not to discuss among yourselves how long the defendant will be required to serve any sentence you decide to impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are no concern of yours.

In denying appellant's motion for new trial on this issue, the trial court referred to this curative instruction and "the fact there's been no evidence presented to suggest that the erroneous instruction in the charge affected the juries [sic] decision or verdict." We agree appellant has presented no evidence to suggest the error affected the jury's decision. Based on this record, we conclude that appellant did not satisfy the second prong of *Strickland*.

And we conclude that appellant has not satisfied the first prong of *Strickland* with regard to his health issues. The record at trial is silent with regard to appellant's health issues.[5] Appellant argues that if his counsel had presented this evidence at punishment, there is a reasonable probability the jury would have recommended community supervision for the state jail felonies instead of assessing a one-year jail sentence.

---

[5] Counsel filed a motion for new trial in which he argued on a "compassionate level" for the trial court to set aside the jail sentence and impose community supervision for the state jail felonies due to appellant's numerous illnesses, including diabetes.

The record is silent about counsel's strategy or tactics with regard to appellant's health issues, and we will not speculate about the basis of his decision. *See Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). Based on this record, we cannot conclude that counsel's performance was deficient. *See Andrews*, 159 S.W.3d at 102. We conclude that appellant did not satisfy his burden under *Strickland*.

We resolve issue five against appellant.

## VIOLATION OF RIGHT TO ALLOCUTE

In issue six, appellant argues that the trial court violated his common law right to allocute in the two state jail felonies.

Allocution refers to a trial court's invitation to a criminal defendant to speak in mitigation of the sentence about to be imposed. *Eisen v. State*, 40 S.W.3d 628, 631–32 (Tex. App.—Waco 2001, pet. ref'd). Texas has a codified version of this right. *See* TEX. CODE CRIM. PROC. ANN. art. 42.07 (West 2006). Appellant concedes that the trial court complied with the statute, but he contends he also had a common law right to allocute in which he could have presented evidence of his health in mitigation of punishment, something he contends the statute did not authorize. But appellant did not ask to allocute, and when the court asked his counsel whether there was "any legal reason why your client cannot now be sentenced in each of these cases" he said "None, your Honor." Consequently, this issue has not been preserved for review. *See Graham v. State*, 498 S.W.2d 197, 198 (Tex. Crim. App. 1973) (no objection in trial court that appellant was denied right of allocution); TEX. R. APP. P. 33.1.

We resolve issue six against appellant.

## GROSSLY DISPROPORTIONATE PUNISHMENTS

In issue seven, appellant argues that the trial court imposed grossly disproportionate punishments in the two state jail felony cases in violation of the Eighth Amendment's prohibition

against cruel and unusual punishment. The State argues that appellant did not raise this claim below and has not preserved it for review on appeal. We agree with the State.

Appellant has not cited and we have not found where he raised this complaint in the trial court. He did not object when the sentence was imposed, and he did not raise this issue in his motion for new trial. Consequently, this issue has not been preserved for our review. *Castaneda v. State*, 135 S.W.3d 719, 723 (Tex. App.—Dallas 2003, no pet.).

We resolve issue seven against appellant.

### CONCLUSION

We affirm the trial court's judgments.


/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
Tex. R. App. P. 47.2(b)

160558F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JOHN WARD HUNT, Appellant

No. 05-16-00558-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F15-00097-U.
Opinion delivered by Justice Lang-Miers.
Justices Bridges and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 1st day of August, 2017.



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JOHN WARD HUNT, Appellant

No. 05-16-00559-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F15-00113-U.
Opinion delivered by Justice Lang-Miers.
Justices Bridges and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 1st day of August, 2017.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHN WARD HUNT, Appellant

No. 05-16-00604-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F10-01239-U.
Opinion delivered by Justice Lang-Miers.
Justices Bridges and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 1st day of August, 2017.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHN WARD HUNT, Appellant

No. 05-16-00605-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F10-01240-U.
Opinion delivered by Justice Lang-Miers.
Justices Bridges and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 1st day of August, 2017.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHN WARD HUNT, Appellant

No. 05-16-00606-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F10-01241-U.
Opinion delivered by Justice Lang-Miers.
Justices Bridges and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 1st day of August, 2017.